**Frank Basil McFARLAND, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71016.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 23, 1992.

Jack V. Strickland, Fort Worth, for appellant.

Tim Curry, Dist. Atty., and C. Chris Marshall and Edward L. Wilkinson, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CAMPBELL, Justice.

Appellant, Frank Basil McFarland, was convicted of capital murder. Tex.Penal Code § 19.03(a)(2). At the punishment phase of appellant's trial, the jury answered affirmatively the special issues set forth in Article 37.071(b) of the Texas Code of Criminal Procedure. The trial judge then sentenced appellant to death as required by Article 37.071(e). Direct appeal to this Court was then automatic. Tex. Code Crim.Proc. art. 37.071(h). We will affirm appellant's conviction and sentence of death.

Appellant raises eighteen points of error. Point of error number three is a challenge to the sufficiency of the evidence at the guilt/innocence stage of trial and will be addressed first. The remaining points will be addressed in the order that follows: points of error numbers five, six, and seven address errors that allegedly occurred during voir dire; specifically, points five and six address the trial court's granting of a State's challenge for cause and subsequent *sua sponte* excusing of a single venire-member and point seven challenges the trial court's granting of a second State's challenge for cause; points of error one, two, four, eight, thirteen, fourteen, fifteen, and sixteen address errors which allegedly were committed or occurred in the guilt/innocence phase of trial; specifically, points of error numbers one and two address the admission into evidence of statements appellant alleges were inadmissible hearsay; point four takes issue with the trial court's admission of evidence relating to appellant's "alleged extraneous illegal activities[;]" point of error number eight alleges improper jury argument; points thirteen and fourteen concern the admission into evidence of allegedly inflammatory photographs; point fifteen takes issue with the admission of evidence regarding DNA testing; and point sixteen alleges error by the trial court in admitting the hypnotically enhanced or induced testimony of a witness; finally, points nine through twelve and seventeen all allege ineffective assistance of counsel at various stages of trial and point eighteen alleges repeated incidences of prosecutorial misconduct.

Viewed in the light most favorable to the verdict, the evidence at trial established the following facts. On the afternoon of February 1, 1988, the victim went to work at a bar in Arlington. Appellant and a friend of

his, Michael Ryan Wilson, were also at the club on this day. At some point in the afternoon, the two men had a drink sent over to the victim. Later, a waitress introduced the victim to the two men. Appellant, Wilson, the victim, and a waitress made plans to go to another bar together later that evening, although the waitress canceled her part of the arrangement.

Around 7:00 p.m. or 8:00 p.m. that evening, the victim went home to change and eat dinner before going out. Several employees of the second bar remember seeing a woman, who fit the description of the victim, arrive alone between 8:00 p.m. and 9:00 p.m. They also recalled her leaving shortly thereafter with two men. Her car was found in the parking lot the next morning.

Approximately 10:00 p.m. or 11:00 p.m. that evening, three teenage boys were walking by a public park when they heard a scream. One stood on a nearby bench to look for the police and saw a car driving away. As the boys continued walking, they noticed someone stumbling in a "kind of drunk manner." As they got closer to the figure, they realized the figure was a woman. When they reached her, they noticed that she had blood on her face. One of the boys asked if she needed help, to which she replied that she did. The other boy immediately ran to the nearest house to call for help. The victim told the boys that she had been sexually assaulted and stabbed.

While the one boy was away, a police officer happened upon the scene. The boys told the officer that the victim said that she had been sexually assaulted and stabbed. As the officer approached the victim, he could see that she had blood on her face, jacket, and shirt, and her hand was cut to the bone. The officer tried to question the victim as much as possible. The victim told him that "[t]hey raped and stabbed me." The officer elicited further information that the two assailants were white men and that the victim had met them at the club where she worked. The officer could not later remember the name of the club, but he was subsequently placed under hypnosis, at which time that information was elicited. When the paramedics arrived, the victim also told them that she had been sexually assaulted and stabbed. The victim died about 3:00 a.m.

A search of the area where the victim was found turned up her purse, shoes, watch, and one earring in a pool of blood at the top of the hill. Additionally, a five hundred foot trail of blood led from where the victim's belongings were found to where she had been discovered. An autopsy revealed that the victim had been stabbed by at least two different types of knives or knife-like weapons. The examination also revealed evidence of sexual intercourse, but was inconclusive as to whether the victim had been sexually assaulted.

At trial, Wilson's girlfriend, Rachael Revill, testified that on the night in question, appellant and Wilson arrived at her apartment. They had left the apartment together in appellant's car earlier that evening and were now returning together. Revill noticed that Wilson's pants appeared to be stained with blood and appellant appeared to have a gash on his hand. After Wilson showered, changed, and gathered his blood-stained clothing, the two men again left. Wilson returned about fifteen minutes later without appellant. Revill said Wilson was surrounded by a "burning odor." Wilson later told his girlfriend that he had burned his clothes because they had blood on them. He also explained that he and appellant had "had to get rid of a girl" because she knew too much about their drug business. Wilson insisted that appellant had actually killed the victim.

At a later time, appellant again picked Wilson up from Revill's apartment and they went to the club where the victim had worked on the day she was killed. Appellant asked a waitress if any detectives had asked anything about him or Wilson. The waitress observed scratch marks down appellant's cheek. Subsequently, Wilson contacted an acquaintance of his and appellant's, Mark Noblett. He told Noblett that he and appellant had been to a club with the victim and that later, appellant sexually

assaulted and stabbed the victim. Wilson also told Noblett that he was afraid of appellant and wanted Noblett to approach the police on his behalf. The two men agreed to meet to next day, but Wilson never showed.

On March 11, 1988, Wilson was found dead in Weatherford. Four days later, Revill contacted the police and told them of Wilson's confession to her on the night of the victim's murder. Warrants were then issued to obtain blood, saliva, and hair samples from appellant and to impound and search his automobile. The search of appellant's vehicle uncovered hairs which proved to be microscopically similar to those found in a Rabbit coat of the type that the victim was wearing the night she was killed. A scarf was also discovered on which was found a pubic hair microscopically similar to the victim's. Finally, the police recovered an earring which was not distinguishable from the earring found at the scene of the murder. A DNA analysis of the semen recovered from the victim's body and found on her clothes did not eliminate appellant as a donor, although it did conclusively establish that, if Wilson was a donor, he was not the sole donor.

■ In point of error number three, appellant challenges the sufficiency of the evidence to support the jury's verdict of guilt on paragraph two of the indictment. Appellant was charged by an indictment alleging capital murder in two separate paragraphs. The only difference between the two paragraphs was the allegation of the weapon used in the offense; the first paragraph alleged the weapon was a "knife," whereas the second paragraph alleged the weapon was a "single edge blade knifelike object unknown to the grand jury." The charge to the jury on guilt/innocence was then set out in the alternative, thereby forcing the jury to elect between one of these two paragraphs or a third choice of "not guilty". The foreman signed below the second paragraph, which read as follows:

PARAGRAPH TWO: AND, IT IS FURTHER PRESENTED IN AND TO SAID COURT, THAT THE SAID FRANK BASIL MCFARLAND, IN THE COUNTY OF TARRANT AND STATE AFORESAID, ON OR ABOUT THE 1ST DAY OF FEBRUARY, 1988, DID THEN AND THERE INTENTIONALLY CAUSE THE DEATH OF AN INDIVIDUAL, TERRY HOKANSON, BY STABBING AND CUTTING HER WITH A DEADLY WEAPON, TO-WIT: A SINGLE EDGE BLADE KNIFELIKE OBJECT UNKNOWN TO THE GRAND JURY, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY, AND THE SAID FRANK BASIL MCFARLAND WAS THEN AND THERE IN THE COURSE OF COMMITTING AND ATTEMPTING TO COMMIT THE OFFENSE OF AGGRAVATED SEXUAL ASSAULT, OF TERRY HOKANSON, ...

Appellant now alleges that the evidence is insufficient in this cause because the State failed to prove: 1) that the object which caused the death of the victim was, in fact, an *unknown* object, and 2) that the Grand Jury exercised reasonable diligence in its efforts to ascertain the identity of the instrument used to cause death.

This Court stated in *Matson v. State*, 819 S.W.2d 839, 847 (Tex.Cr.App.1991) that:

When an indictment alleges that the manner or means utilized to inflict an injury is unknown and the evidence at trial does not show what type of object was used, a prima facie showing exists that the object was unknown to the grand jury. [Citations omitted.] If, however, evidence at trial shows what object was used to inflict the injury, an issue is raised with respect to whether the grand jury had information, when it handed down the indictment, as to the object used. [Citation omitted.] Only in such a case, must the State prove that the grand jury did not know the manner or means of inflicting injury and that the grand jury used due diligence in its attempts to ascertain the manner or means.

Appellant does not point us to a place in the record, nor can we find one, where any

evidence was introduced that the weapon used was, in fact, a knife. The only evidence we have been able to discern refers to the characteristics of the possible weapon or weapons as being "knifelike" in nature. Therefore, there is no showing of the absence of due diligence on the part of the grand jury. Point of error number three is overruled.

In points of error five and six, appellant challenges the excusing of veniremember Dorothy Hill. The State questioned Hill about the terms "intentionally" and "deliberately" and the following transpired:

[THE STATE:] Do you see a distinction between "intentionally" as a requirement in the first stage and "deliberately" as now set out in the second stage? Do you see a difference?

[VENIREMEMBER:] What is the difference?

[THE STATE:] I am asking you. You have got to tell me if you see a difference?

[VENIREMEMBER:] I don't see a difference.

[THE STATE:] Okay.

[VENIREMEMBER:] If you intentionally set out to do something, as far as I am concerned, you deliberately set out to do it.

[THE STATE:] Okay. And what you are telling us as you are seated here today then—are you telling us that if you were to have found someone guilty of intentionally committing the crime at the first stage of the trial—

\* \* \* \* \* \*

—would you automatically answer this question yes, because there is no difference in your mind between deliberately and intentionally?

[VENIREMEMBER:] Yes, I think I would.

Hill never wavered from this position during the State's questioning. Subsequently, the State asked the veniremember about her opinions concerning the minimum and maximum punishments for possible lesser included offenses. The following colloquy is exemplary of this line of questions:

[THE STATE:] Now, in terms of aggravated sexual assault, you know that the minimum range of punishment, even in aggravated sexual assault, not only is just five years in the penitentiary, but it could be as little as five years probation for rape with a deadly weapon being used or exhibited to compel or force the other to participate. Do you understand that?

[VENIREMEMBER:] Yes.

[THE STATE:] Okay. Could you consider assessing or giving five years probation in aggravated sexual assault?

[VENIREMEMBER:] No.

[THE STATE:] Under no circumstances?

[VENIREMEMBER:] No.

Finally, at the end of the State's questioning, the prosecutor asked Hill, "Is there any event that's scheduled the next few days in your life, or maybe the next month or maybe six weeks that would prevent you from sitting in this case and listening attentively ... to all of the evidence?" The veniremember answered "Yes.... My oldest daughter's wedding." Veniremember Hill expressed that she would like to do her civic duty, but she had worked very hard on this wedding and it was very important to her. She also told the State that last minute details and possible sequestering would weigh heavily enough on her mind that she could not listen to the evidence attentively or fully concentrate on the trial. Ultimately, the State said it had no further questions of the veniremember, but challenged her:

based upon the answers she has given us and ask the Court to consider the challenge for cause not only in this regard but the others that we mentioned earlier on, in fairness to everyone.

Instead of ruling on the State's challenge, the trial judge simply asked appellant, "Do you want to talk to this lady[ ]?" Appellant responded in the affirmative and proceeded with the voir dire examination:

[DEFENSE COUNSEL:] See, if you were selected as a juror, things that needed to be done about the wedding, you would have time to do that before the case ever got started because we are

not going to get started for a couple of weeks.

THE COURT: Counsel, I appreciate what you are trying to do, but I never did take an oath we were not going to work on Saturdays.

[DEFENSE COUNSEL:] I know that, Judge.

THE COURT: So, now, that Saturday, I certainly, if at all possible, we would give it consideration, but there are no guarantees.

[DEFENSE COUNSEL:] I understand.

[THE] JUROR: I think I am disqualified.

THE COURT: You are.

[THE] JUROR: I think I am dismissed.

THE COURT: Well, you may be, but I think I have to say that.

\* \* \* \* \* \*

Go ahead, Counsel.

[DEFENSE COUNSEL:] We submit she's qualified, Your Honor.

THE COURT: I am going to excuse the juror. You may go now. Thank you very much.

\* \* \* \* \* \*

I find that this juror was certainly direct, open and honest in her answers. I find that she disqualifies on the difference between "intentional" and "deliberate." I find that she's disqualified on the issue of minimum punishment for aggravated sexual assault. But most of all, obviously, a wedding of an oldest child is such an event that though she has stated that she would try not to let it interfere with her duty, that it would always be in her mind. And a case of this complexity requires constant and undying attention. And for those three reasons I find this juror is disqualified.

[DEFENSE COUNSEL:] Your Honor, we object to her disqualification in that the defense was not allowed to question her specifically on two of the grounds that the Judge has now stated as grounds for disqualification.

\* \* \* \* \* \*

THE COURT: Well, the Court expressly finds that [defense counsel] said he submits she's qualified and didn't ask any more questions. I am sorry that I assumed that that was—we were going to continue to have any more questions.

\* \* \* \* \* \*

[DEFENSE COUNSEL:] Judge, she was not challenged by the State for any other reason other than the fact that she could not attentively listen to the evidence. She was not challenged by the State based on her answers to the minimum punishment for aggravated sexual assault, nor was she challenged by the State on the "deliberately" and "intentionally" ground. So I had no idea that the Court was going to try to excuse her on those grounds and it limited my cross examination of her to the whether or not she could be an attentive juror.

THE COURT: Well, you weren't limited by me, you were limited by your own understanding.

In point of error number five, appellant contends that the trial court erred by granting the State's challenge for cause to veniremember Hill. Given our disposition of point of error number six, further discussion of point of error number five is unnecessary.

■ In the related point of error number six, appellant contends the trial court erred for *sua sponte* excusing veniremember Hill. This point is clearly governed by our recent opinion of *Butler v. State*, 830 S.W.2d 125 (Tex.Cr.App.1992). In that case we held that, "[w]hen conducting *voir dire*, the trial judge has the discretion, upon a reason sufficient to satisfy the court, to excuse *an otherwise qualified* venireperson from jury service." (emphasis in original.) *Id.; See* Tex.Code Crim. Proc. art. 35.03. We also stated that:

[w]hen rendering an excuse under Article 35.03 a trial judge is not ... limited to the period before questioning of the venire takes place.

\* \* \* \* \* \*

[T]he judge *must* retain the ability to render an excuse in order to rectify problems created by such changed circumstances as, e.g., a venireperson's sudden

realization that an excuse applies to her or to new and unforeseen developments which would render venirepersons incapable of fairly considering the facts before them.

*Butler, supra.* (emphasis in original.)

The record clearly supports that such is the situation in the instant case. Information came out very late in the questioning of veniremember Hill concerning the upcoming wedding of her daughter. Hill was quite clear that this wedding and its details were and would continue to be weighing heavily on her mind. Point of error number six is overruled.

■ In point of error number seven, appellant contends that the trial court erred in granting the State's challenge for cause as to veniremember Wesley Felder on the basis of his bias against the death penalty. This Court has held that in order for a veniremember to be challenged for cause on this basis, it must be shown that the veniremember's views on the death penalty would "prevent or substantially impair the performance of his or her duties in accordance with the oath taken and the trial judge's instructions." *Jones v. State,* 843 S.W.2d 487, 497 (Tex.Cr.App.1992). The trial court's ruling on such a challenge for cause on this basis is reversible only if the judge clearly abused his discretion in granting the challenge. *Id.* This standard does not require that a veniremember's bias be proven with "unmistakable clarity" and deference must be paid to the trial judge who is in a position to see and hear the juror. *Bird v. State,* 692 S.W.2d 65, 75 (Tex.Cr.App.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1238, 89 L.Ed.2d 346 (1986).

■ The record reveals that Felder indicated on his initial questionnaire that he was strongly opposed to the death penalty.[1] He said that he "could never, under any circumstances, return a verdict which required that the death penalty be assessed[.]" Testimony revealed confusion and vacillation on the part of Felder. Pertinent parts of that testimony are as follows:

[THE STATE:] How long have you had this feeling about [the death penalty]?

[THE VENIREMEMBER:] Ever since I could understand what it meant.

[THE STATE:] ... [D]o you feel that ... there might be some circumstances which [sic] the death penalty might be appropriate?

[THE VENIREMEMBER:] No. I could never do it.

[THE STATE:] Under any circumstances?

[THE VENIREMEMBER:] Right.

The State then proceeded to explain the process of answering questions on the punishment stage instead of requiring the jury to actually assess a punishment.

[THE STATE:] All three of questions [sic] must be answered yes for a death penalty.

\* \* \* \* \* \*

A no answer to any one of questions [sic] means a life sentence would be involved, that is, the Court would be ordered to assess a life sentence at that point in time.

If the evidence was proved to you beyond a reasonable doubt that each of those questions should be yes, would you still vote no because of your feeling about the death penalty in order that a life sentence would be assessed?

[THE VENIREMEMBER:] No, that would be incorrect.

[THE STATE:] Based on what you feel?

[THE VENIREMEMBER:] No.

[THE STATE:] Knowing that if you did answer all of three questions yes the death penalty would be assessed?

[THE VENIREMEMBER:] Yes.

[THE STATE:] Do you feel that you could participate in that?

[THE VENIREMEMBER:] No. I don't think so.

[THE STATE:] Why is that?

[THE VENIREMEMBER:] Because I couldn't sentence anyone to death.

\* \* \* \* \* \*

---

1. This information was brought out through the testimony of the veniremember. The questionnaire forms themselves do not appear to have been included with the appellate record.

[THE STATE:] Do you feel, this objection and this feeling you have toward the death penalty, do you feel that those feelings would overcome your civic obligation which would be to serve on a jury and to be fair and impartial? Do you feel that that feeling you have would overcome that obligation?

[THE VENIREMEMBER:] Yes, I would rather not participate on it if it means I would have to, you know, and the facts are all correct and to give an honest answer I rather [sic] not sentence somebody to death.

THE COURT: Well, we are just trying to understand you. You say you would rather not. I don't think anybody in this room is anxious to do that, but the question is whether or not if you took your oath as a juror you could do your duty as a juror and do what is necessary?

[THE VENIREMEMBER:] Yes, if the facts were all correct and all my answers came out to be yes on those three questions that means he would, you know, be killed.

[THE STATE:] The Judge would sentence him to death.

[THE VENIREMEMBER:] And I just couldn't do that.

[THE STATE:] Would you automatically—as I told you about the questions on it, the jury must be unanimous as to all of those issues being answered yes, it must be all 12 of you. The jury must have at least ten no votes to any one of those questions and a no vote on any one of questions means the Judge is ordered to give a life sentence. Do you follow me on that?

[THE VENIREMEMBER:] Yes, and I would not give a dishonest answer if that's what you mean.

The State then challenged Felder for cause and appellant proceeded with his questions. Appellant began his questioning of Felder with an explanation of the bifurcated system of trial, the State's burden of proof, and the questions Felder might be asked if the trial proceeded to the punishment stage.

[THE DEFENSE:] You would be asked whether the conduct of the Defendant that caused the death of the deceased was committed deliberately and with a reasonable expectation that death of the deceased or another would result. If the State proved that to you beyond a reasonable doubt you wouldn't have any problem answering that yes, would you?

[THE VENIREMEMBER:] No, sir.

[THE DEFENSE:] Okay. I mean, you would be honest with your answer?

[THE VENIREMEMBER:] Yes.

[THE DEFENSE:] Same way with No. 2. The State would have to prove to you beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society before you would be justified in answering that one yes.

[THE VENIREMEMBER:] Right.

[THE DEFENSE:] And would you be honest and answer it yes, if they proved it to you beyond a reasonable doubt?

[THE VENIREMEMBER:] Yes.

\* \* \* \* \* \*

[THE DEFENSE:] You a [sic] wouldn't falsify an answer to these questions, would you?

[THE VENIREMEMBER:] No, sir.

Then the State questioned the veniremember further and received the following responses:

[THE STATE:] [Y]ou said that you could never under any circumstances return a verdict which required that the death penalty be assessed. If you answered those three questions [ ] yes, that would be your verdict.

[THE VENIREMEMBER:] But that was if y'all proved to me, you know, without any doubt that he did it, you know, that he did any of those acts.

[THE STATE:] Do you understand that our burden of proof is not beyond any doubt, it's just beyond a reasonable doubt?

[THE VENIREMEMBER:] Yes.

\* \* \* \* \* \*

[THE STATE:] [Y]ou are telling me now we would have to remove every doubt in your mind?

[THE VENIREMEMBER:] Yes.

[THE STATE:] Every single doubt?

[THE VENIREMEMBER:] Yes.

[THE STATE:] So, in essence, we would have to essentially make you the man on the street that you were there and that way you would know?

[THE VENIREMEMBER:] Yes.

While appellant managed to get the veniremember to state that he would answer the punishment questions truthfully, this is not sufficient in this case to prevent his disqualification. As we stated in *Felder v. State*, 758 S.W.2d 760, 766 (Tex.Cr. App.1988):

> The fact that a prospective juror states that he would answer the punishment questions truthfully to the best of his knowledge is not sufficient to prevent his disqualifications where the voir dire examination, considered as a whole, discloses strong feelings which would prevent him from abiding by existing law or fairly considering the evidence as adduced.

*See also Vigneault v. State*, 600 S.W.2d 318, 326–27 (Tex.Cr.App.1980). The record supports the trial judge's ruling on the challenge for cause. Finding no abuse of discretion, we overrule point of error number seven.

■ In points of error numbers one and two, appellant complains that the trial court erred in allowing into evidence certain statements of Rachael Revill and Mark Noblett, respectively. He contends that their testimony concerning statements allegedly made by Michael Wilson, appellant's accomplice, which implicated appellant in the instant offense, constituted hearsay and were admitted in violation of Tex.R.Crim.Evid. 801(e)(2)(E) [2]. He argues that any conspiracy that may have existed had terminated by the time Wilson made the alleged statements. However, we need not address the question of when the conspiracy existed or, even if one existed, because the State contends, and we agree, that the complained-of statements were admissible as statements against interest—an exception to the hearsay rule. Tex.R.Crim. Evid. 803(24). Rule 803(24) states in pertinent part that

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> **(24) Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Appellant challenges several statements made by both Revill and Noblett. Revill's testimony revealed the following statements of which appellant now complains:

> [H]e [Wilson] told me that they had to burn the clothes because they had blood on them.

> \* \* \* \* \* \*

> I asked him, you know, why they had to burn clothes, why there was blood on the clothes, and—

> \* \* \* \* \* \*

> He turned and looked at me, he was very upset, and told me that they had to get rid of a girl.

> \* \* \* \* \* \*

> I assumed that he meant kill [when he said "get rid of"].

> \* \* \* \* \* \*

**2.** Tex.R.Crim.Evid. 801(e)(2)(E) provides in pertinent part that:

(e) A statement is not hearsay if:

(2) The statement is offered against a party and is (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

I asked him, you know, I said, "Who did it?" and he said, "Frank did it."

\* \* \* \* \* \*

He said, "We had to get rid of a girl."

\* \* \* \* \* \*

"Because she knew too much about the drugs."

\* \* \* \* \* \*

[H]e told me that I shouldn't tell anybody.

\* \* \* \* \* \*

He—he said that Frank could hurt me.

\* \* \* \* \* \*

[H]e said, "Don't worry. Her boyfriend is going to get blamed for it because they had been fighting a lot recently."

These statements clearly indicate that Wilson was involved with appellant in some illegal act which could well subject him to criminal liability.

The requirement of Rule 803(24) that statements exposing the declarant to criminal liability be corroborated is also fulfilled. *See Green v. State,* 840 S.W.2d 394 (Tex. Cr.App.1992). Several facts were proven at different times which all corroborate the statements Wilson made to Revill. The victim, before she died, told witnesses that she had been raped and stabbed by two white men she had met at the club that night. Revill testified that she had seen appellant pick Wilson up earlier in the evening in appellant's car and return together later in the same car. Witnesses testified that appellant and Wilson had been at the club where the victim worked earlier that evening and that she had been introduced to the two of them. A waitress testified that the four of them were supposed to go to another bar later that evening. One of the victim's earrings and fibers consistent with the fibers in the coat she had been wearing were all later discovered in appellant's car. Point of error number one is overruled.

Noblett explained to the jury in his testimony that Wilson called him to set up a meeting at a hotel in which Wilson was staying. Noblett recounted his observations of Wilson to the jury noting that he was "extremely nervous and apprehensive," and that he was "jittery." Upon noticing Wilson's odd behavior, Noblett asked him if his behavior "ha[d] to do with the murder of the shoeshine girl," to which Wilson responded that it did. At this point, Noblett told the jury the following:

[H]e explained that they had been— "they" being Michael Wilson and [appellant] and [the victim] had been at a club, Manhattan's.

\* \* \* \* \* \*

He told me that they had left and he told me that—

\* \* \* \* \* \*

"They" being Michael Wilson, [the victim] and [appellant] had left the club and he mentioned that—he said that they had—a rape and a murder had taken place.

\* \* \* \* \* \*

[H]e said that they had stabbed this girl in a parking lot[.]

\* \* \* \* \* \*

He said it was in a church parking lot.

\* \* \* \* \* ·\*

He said "shoeshine girl."

\* \* \* \* \* \*

He told me that, of course, he wanted me to go to the police, that he was afraid, that he ... owed [appellant] money, that he had been cut off from [appellant] as far as a place to live and money to live on.

Again, we conclude that these statements were properly admissible as an exception to the hearsay rule since Wilson implicated himself in the commission of several crimes. We find that these statements were sufficiently corroborated by the aforementioned facts. Point of error number two is overruled.

In his fourth point of error, appellant complains that the trial court erred at the guilt/innocence phase of trial in allowing evidence of appellant's alleged extraneous illegal activities. Appellant points out three different instances in which he maintains that testimony was allowed in viola-

tion of Tex.R.Crim.Evid. 404 and a Motion in Limine which appellant filed prior to trial.[3]

Generally, once evidence is deemed to be relevant under Tex.R.Crim.Evid. 401 and 402, then its admissibility is governed by Rule 404, *supra*. *See Montgomery v. State*, 810 S.W.2d 372 (Tex.Cr.App.1990) (opinion on rehearing). Rule 404(b) states in pertinent part that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

 In *Montgomery v. State, supra,* this Court set out, with some detail, the roles of both the trial court and a reviewing court when determining the admission of evidence under Rule 404. Concerning the role of the trial court, we stated in *Montgomery* that, when a party attempts to adduce evidence of "other crimes, wrongs, or acts," the opponent of that evidence must object in a timely fashion in order to preserve error for appeal. Once that complaint is lodged, the proponent of the evidence must then satisfy the trial court that such extraneous act has relevance *apart from* or *beyond* its tendency "to prove character of a person in order to show that he acted in conformity therewith."

 If the trial court determines that the evidence has no relevance apart from character conformity, then the evidence is inadmissible and the trial court has no discretion to admit it. On the other hand, the proponent of the evidence may persuade the trial court that the extraneous offense evidence tends to establish "motive, oppor-tunity, intent, preparation, plan," or one of the other factors set out in Rule 404(b). This would then illustrate to the trial court that the offered evidence has relevance apart from or beyond character conformity.[4] If the latter is the case, the trial judge would then have discretion to admit the evidence. *Montgomery*, 810 S.W.2d at 388. However, the trial judge, upon timely further request, should instruct the jury that the evidence is limited to whatever specific purpose the proponent advocated. *Id.;* Tex.R.Crim.Evid. 105(a).

 Once the trial court has ruled on whether the evidence has relevance beyond character conformity, it has ruled on the full extent of the opponent's objection. Consequently, appellate error has only been preserved as to whether such evidence was admissible under Rule 404(b).

 While such evidence may be determined by the trial court to be admissible under Rule 404(b), the same evidence may nevertheless be excluded if the trial court determines, in its discretion, that the probative value of such evidence is substantially outweighed by unfair prejudice. Tex.R.Crim.Proc. 403. However, the trial court need not engage in this balancing test unless the opponent of the evidence further objects based upon Rule 403.[5] *Montgomery, supra.* Furthermore, when the trial court is called upon by sufficient objection to balance probativeness and prejudice, a presumption exists favoring the former. *Id.*

As to the function of the appellate court, this Court said in *Montgomery*, that, "[s]o long as the trial court thus operates within the boundaries of its discretion, an appellate court should not disturb its decision, whatever it may be." 810 S.W.2d at 390. In other words, as long as the trial court's ruling is within the zone of reasonable dis-

---

3. The first two instances involved the testimony of two witnesses that appellant was involved in drug dealing. The third instance involved testimony concerning the death of co-defendant Wilson and the possible cause of that death.

4. This list is merely exemplary and not exhaustive. *Montgomery v. State*, 810 S.W.2d at 387.

5. Once such an objection is made, though, the judge no longer has the discretion to refuse to engage in a balancing test. *Montgomery*, 810 S.W.2d at 389.

agreement, an appellate court will not disturb that ruling. *Montgomery*, 810 S.W.2d at 391.

Hence, we may now address the three instances of which appellant complains. The first complaint appellant raises concerns Rachael Revill's testimony of appellant's involvement in drug dealing. The record reveals that the following occurred:

[THE STATE]: How often would you see [appellant]?

[WITNESS]: When I first started dating [co-defendant Wilson] I saw him a lot because we'd always go drinking together. During the middle of our relationship I didn't see him that much, and towards the end when they got into drug dealing I saw [appellant] a lot more.

\* \* \* \* \* \*

[THE DEFENSE]: Your Honor, at this time we're going to object to this witness' last statement.

THE COURT: I sustain the objection.

[THE DEFENSE]: We ask the jury be instructed to disregard.

\* \* \* \* \* \*

THE COURT: All right. Jury will disregard any statement by the last witness concerning itself with some other illegal conduct, if any.

A motion for a mistrial was thereafter denied. Even if the general, ambiguous objection lodged by appellant can be construed as an objection under Tex.R.Crim. Evid. 404, then appellant still cannot prevail since he did not further object under Rule 403. *Montgomery, supra.*

The second instance of which appellant complains involves the testimony of Mark Noblett. This testimony also alluded to drugs and drug dealing. The testimony was first elicited on appellant's cross-examination of the witness. Noblett was being questioned about an amount of money which he owed to appellant, when he stated that appellant had come to him many times "about purchasing drugs." Appellant immediately objected that the answer was non-responsive and he asked for and received an instruction from the trial court for the jury to disregard the answer. On

redirect by the State, the following occurred:

[THE STATE]: Tell the jury how you arrived at that particular figure, how would you determine that ... you owed [appellant] 200 to $300.

[THE DEFENSE]: Excuse me, Counsel. Your Honor, again we object. This is an attempt to go into matters that the Court has deemed not admissible before this jury. We object to it for that reason.

THE COURT: Overruled. He may answer.

[THE STATE]: Can you tell the jury how you came to determine that figure cross examined [sic] you?

\* \* \* \* \* \*

[THE WITNESS]: Well, he had given me money.

[THE STATE]: "He" who?

[THE WITNESS]: "He" being McFarland, and Michael when I first met them had given me money to purchase drugs with on their behalf.

[THE DEFENSE]: Your Honor, that's nonresponsive as to how he calculates the figure. That's nonresponsive, Judge, that giving him money to buy drugs.

THE COURT: Overruled, Counsel.

[THE DEFENSE]: We object to it.

THE COURT: I would like for you to get to the calculations.

[THE WITNESS]: He specifically gave me $200 on the first meeting to purchase drugs.

Nowhere in this exchange before the jury (and appellant has pointed us to none other) can we find a timely and sufficiently specific objection regarding extraneous offenses. The objection that was propounded immediately after the mention of "drugs" was only as to its non-responsive nature. Since the complaint at trial does not comport with the complaint on appeal, nothing has been preserved for our review on this point. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex.Cr.App.1990).

The third and last instance of which appellant complains concerns testimony elicited from a deputy sheriff regard-

ing the death of co-defendant Wilson. The complained-of testimony is as follows:

[THE STATE:] Did you see the body?

[THE WITNESS:] Yes, I did.

[THE STATE:] Did you see whether or not the body had been shot?

[THE WITNESS:] Yes.

At this point, appellant immediately asked to take up the matter outside the presence of the jury. This request was granted by the trial court. Once outside the presence of the jury, appellant objected by saying, "[w]e object to the last question of Counsel and the resulting answer[,]" and the objection was sustained. After further discussion was had and the jury was returned to the courtroom, appellant repeated this objection almost verbatim, the trial court again sustained it, and appellant requested and received an instruction to the jury to disregard the question and the resultant answer. Even assuming that the objection posed by appellant was sufficiently specific to preserve error on this point under *Montgomery, supra* or Tex.R.App.Proc. 52(b), we still find no reversible error in this instance. The trial court instructed the jury to disregard the complained-of question and the resulting answer. Thus, error, if any, was cured.[6] *Nobles v. State,* 843 S.W.2d 503, 514 (Tex.Cr.App.1992). Point of error number four is overruled.

Appellant complains in point of error number eight that the trial court "committed reversible error in denying appellant's timely and proper motion for mistrial based upon improper jury argument." We first set out the context from which the complained-of statements arose.

The record reveals that the offense was committed on February 1, 1988. On February 12, 1988, appellant and Wilson were questioned while not under arrest nor in custody. During this session, appellant told the officer that, during the night of the murder, he and Wilson were "out collecting a debt." When the officer asked from whom appellant was collecting the

debt, appellant told him that was "none of [his] business." Appellant was subsequently arrested pursuant to a warrant on March 23, 1988, without ever having revealed this potential alibi witness (the debtor) to the police. Jury selection for trial finally commenced in September, 1989.

Given the above context, appellant specifically complains of the following statement which was made by the State towards the conclusion of its closing argument at guilt/innocence:

I submit to you that at least from February the 1st or maybe a few days before, [appellant] and [co-actor], they weren't being truthful, they weren't being honest and open with the people that were coming into contact with them every day. I submit, too, for your consideration that there is no man, there is no woman whose sexual passion, her favor, his desire, is worth one year and seven months incarceration if consensual sexual intercourse is to be believed. It ain't worth it. And when someone tells you on February the 12th of 1988 she was raped and murdered, you don't lie about your whereabouts. I don't care—hey, give the name of the debtor, this is where he is, go talk to him, he will tell you.

Immediately following this, appellant objected that this was a direct comment on his failure to testify. The trial court sustained the objection and instructed the jury to "disregard any duty on the part of [appellant] to present anything." Appellant then claimed that "[i]t is so highly prejudicial that no instruction will cure it, Your Honor. We ask for a mistrial." This request was overruled by the trial court. Appellant now complains that this was a direct comment both on his failure to testify and on his post-arrest silence. He also contends that the instruction given by the trial court was inadequate because it implied a duty on the part of appellant to present something. We disagree with these contentions.

**6.** The main thrust of appellant's complaint seems not to be so much the *manner* of Wilson's death, but the fact that he was killed and did not die of natural causes. It is noteworthy then that appellant, himself, on his closing argument at the guilt/innocence stage of trial, told the jury that "Mike Wilson got killed."

We first note that appellant's objection at trial was timely as it pertains to this argument and was specific enough that it apprised the trial judge of the basis of the complaint. *See Meek v. State,* 628 S.W.2d 543 (Tex.App.—Ft. Worth 1982, pet. ref'd). To constitute proper jury argument, the argument must encompass one of the following: 1) summation of the evidence presented at trial, 2) reasonable deduction(s) drawn from that evidence, 3) answer(s) to the opposing counsel's argument, or 4) a plea for law enforcement. *Gaddis v. State,* 753 S.W.2d 396, 398 (Tex.Cr.App.1988). This Court noted in *Gaddis* that challenges to jury argument should be considered in the context in which they appear. Furthermore,

> Counsel is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. [citations omitted]. Conversely, the jury argument must be extreme or manifestly improper, or inject new and harmful facts into evidence to constitute reversible error.

The State's comments concerning what may or may not have happened on February 1st or February 12th can reasonably be construed to be a summation of the evidence presented at trial or reasonable deductions drawn from that evidence. *Gaddis, supra.* Thus, we conclude that the first and fourth sentences were proper jury argument. Likewise, the fifth sentence constitutes proper jury argument. This statement, in conjunction with the sentence just prior to it, can be construed as a reasonable deduction from the evidence such that on February 12th, appellant was

refusing to cooperate with the police because he was somehow involved in the crime.

It can also be construed as a comment on the failure of appellant to call an alibi witness which he claims to have had. This is also an appropriate area of jury argument. As we said in *Albiar v. State,* 739 S.W.2d 360, 362–3 (Tex.Cr.App.1987):

> a prosecuting attorney may comment in his final jury argument on the failure of a defendant to call a competent and material witness,.... The failure to produce available evidence justifies an inference that it would be unfavorable to the defendant.

Finally, the record reveals that the State's comment on appellant's spending one year and seven months in jail was initially made by the first prosecutor at the beginning of the State's closing argument with absolutely no objection by appellant. Where the same evidence or argument is presented elsewhere during trial without objection, no reversible error exists. *Greenwood v. State,* 740 S.W.2d 857, 860 (Tex.App.—Dallas 1987); *Thompson v. State,* 537 S.W.2d 732, 735 (Tex.Cr.App. 1976). Finding no reversible error in the complained of statement, we overrule point of error number eight.

In points of error numbers thirteen and fourteen, appellant complains that the trial court erred in admitting "inflammatory and prejudicial" photographs over appellant's objections. Specifically, he complains of one pre-death emergency room photograph (State's exhibit no. 16) and one autopsy [7] photograph (State's exhibit no. 24.) Appellant alleges that the photographs were in-

---

7. Appellant alleges that this second picture is a post-autopsy photograph since it depicts two apparent incisions which have been sutured shut seemingly without much precision. The State, on the other hand indicates that this photograph is, in fact, just prior to the autopsy and the incisions of which appellant complains were inflicted by surgical procedures.

The record is not *clear,* as the State asserts, that the photograph was taken before the medical examiner began the autopsy as the record merely shows on the voir dire examination of the witness that took the photograph that:

[THE DEFENSE:] Did you just come at the end of the procedure [referring to the autopsy]?
[WITNESS:] No, I came at the first of it.
[THE DEFENSE:] And then left?
[WITNESS:] Yes, ma'am, after I took the pictures.

This recitation does not indicate whether or not the medical examiner had already performed any procedures whatsoever. Other testimony from an emergency room doctor, however, does imply that the complained of incisions were indeed made in the emergency room and *not,* as appellant argues, during the autopsy.

troduced purely for prejudicial and inflammatory purposes and, as such, constituted error. The State counters that the first photograph was probative to prove the identity of the victim [8], the wounds inflicted, and inferentially, because of the nature of the wounds, appellant's intent. The State contends that the second photograph was introduced to show the location and manner of the wounds inflicted.

■ The admissibility of such evidence is governed by Tex.R.Cr.Evid. 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

See *Long v. State*, 823 S.W.2d 259 (Tex.Cr. App.1991), *cert. denied,* — U.S. —, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Rule 403 favors the admission of relevant evidence [9] and implies a presumption that relevant evidence will be more probative than prejudicial. *Green v. State,* 840 S.W.2d 394, 410 (Tex.Cr.App.1992), (and cases cited therein.) As we noted in *Long, supra* (quoting from *Green, supra*):

> A court may consider several factors in determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice. These factors include, but are not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. (Citation omitted.) The availability of other means of proof and the circumstances unique to each individual case must also be considered.

■ The first photograph of which appellant complains is an 8″ × 10″ color photograph. It shows almost the full length of the victim as she is lying on a hospital gurney. She has no clothes on the upper part of her body and various medical tubes and equipment is in both the forefront and background of the picture. Some blood appears and some wounds are readily identifiable; however, the photograph does not seem any more gruesome than would be expected after such an offense. Also, this seems to be the only photograph of the victim submitted which depicts her after her injuries were inflicted, but prior to death. Given the circumstances, we determine that the probative value of State's exhibit no. 16 was not substantially outweighed by any prejudice. Therefore, we conclude that the trial court did not abuse its discretion in admitting this exhibit at trial.

■ The second photograph of which appellant complains is also an 8″ × 10″ color photograph. This photograph shows a close-up, unclothed view of the right breast and a portion of the upper right torso. The wounds on this part of the victim's body are clearly the central focus of the picture. A stitched incision runs through the middle of the wounds with a similar incision portrayed in the right hand corner of the picture. Testimony indicates that these incisions were the result of medical procedures designed to save the victim. Some liquid discharge appears in and around the wounds. Finally, the record indicates that this was one of fifteen photographs submitted by the State to show 43 stab wounds and 14 cuts and defensive wounds. This is the only one of those fifteen photographs which depicts the particular wounds shown. Given the circumstances, we find that the trial court did not err in finding that the probative value of State's exhibit no. 24 was not substantially outweighed by any prejudice. Therefore, we conclude that the trial court did not abuse its discretion in admitting this exhibit at trial. Points of error numbers thirteen and fourteen are overruled.

---

8. *See Green v. State,* 840 S.W.2d· 394, 410 (Tex. Cr.App.1992).

9. The parties do not argue that the photographs are not relevant. The identity of the victim and the manner and means of death surely are facts that are of consequence to the determination of the controversy. *See Long,* 823 S.W.2d at 271–2, fn. 18.

Appellant complains in point of error number fifteen that the trial court reversibly erred in admitting scientific evidence of DNA [10] testing in violation of the *Frye* [11] rule. This issue was recently addressed by this Court in the case of *Kelly v. State,* 824 S.W.2d 568 (Tex.Cr.App.1992), and was decided adversely to appellant. We overrule point of error number fifteen.

In point of error number sixteen, appellant seemingly complains of the substantive admissibility of hypnotically enhanced testimony. However, in actuality, appellant is complaining that the trial court erred in overruling his motion to suppress because, first, the trial judge "failed to enter into the Record" what factors he took into account in making his ruling, and second, the trial court failed to hear testimony from appellant's expert witness at the pretrial hearing.

▪ As to the first complaint, a trial judge implicitly makes findings of fact and conclusions of law when he determines the admissibility of evidence. However, he is not mandated by *Kelly v. State,* 824 S.W.2d 568 (Tex.Cr.App.1992), or any other authority which we can discern, to *sua sponte* put these findings or conclusions *on the record* as appellant contends he must do.

As to the second complaint, the record reveals that, after the State had finished its direct examination of the hypnotist and played the tape of the hypnotic session for the trial court, appellant's counsel took the stand to testify. Appellant's attorney testified that appellant only received notice of the hearing on the motion to suppress at 5:15 p.m. the previous day and made an oral motion for a continuance of the hearing until appellant's out-of-town expert could be present.

▪ While not expressly ruling on appellant's motion for continuance, the trial court informed appellant that he would be allowed to supplement the record later with a summary or affidavit of his expert's proposed testimony. Since he failed to obtain a ruling on his motion for a continuance, appellant has failed to preserve any error as to this contention. *See Aranda v. State,* 640 S.W.2d 766, 776 (Tex.App.—San Antonio 1982). Furthermore, we find no evidence that appellant ever supplemented the record with an affidavit or summary of his own expert witness' testimony. *See Tatum v. State,* 798 S.W.2d 569, 571 (Tex. Cr.App.1990). Point of error number sixteen is overruled.

In points of error nine through twelve and seventeen, appellant alleges that he was denied the effective assistance of counsel by trial counsel's: 1) failing to object to improper jury argument; 2) requesting that the trial court not charge the jury on the lesser included offense of murder; 3) failing to object to hearsay statements allegedly made by the victim; 4) eliciting previously unadmitted evidence of an extraneous offense on cross-examination of a witness; and 5) failing to put on available mitigating evidence on behalf of appellant at the punishment stage of trial.

▪ The standard for reviewing ineffective assistance of counsel claims in a capital case involves the application of a two-prong test. First, appellant must demonstrate that counsel's representation was deficient and not reasonably effective. Secondly, appellant must show that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[12] In other words, appellant must show that 1) counsel's representation fell below an objective standard of reasonableness (based on prevailing professional norms), and 2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; with that "reasonable probabili-

---

10. Deoxyribonucleic acid.

11. *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).

12. This Court adopted the *Strickland* standard in *Hernandez v. State,* 726 S.W.2d 53, 56 (Tex.

Cr.App.1986) and *Bridge v. State,* 726 S.W.2d 558, 571 (Tex.Cr.App.1986). Furthermore, in *capital* cases, this standard is applied to both the guilt/innocence phase of trial *and* the punishment phase. *See Craig v. State,* 825 S.W.2d 128 (Tex.Cr.App.1992).

ty" being a probability sufficient to undermine confidence in the outcome. *Derrick v. State*, 773 S.W.2d 271, 273 (Tex.Cr.App.), *cert. denied*, 493 U.S. 874, 110 S.Ct. 209, 107 L.Ed.2d 162 (1989); *Miniel v. State*, 831 S.W.2d 310, 323 (Tex.Cr.App.1992). This two-pronged test is the "benchmark for judging ... whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland, supra.*

▇▇▇▇ This standard has never been interpreted to mean that the accused is entitled to perfect or errorless counsel. *Bridge v. State*, 726 S.W.2d 558, 571 (Tex. Cr.App.1986). In fact, isolated instances in the record reflecting errors of omission or commission do not render counsel's performance ineffective, nor can ineffective assistance of counsel be established by isolating one portion of trial counsel's performance for examination. *Id.* Rather, whether the *Strickland* test has been met is to be judged by "the totality of the representation" and, "judicial scrutiny of counsel's performance must be highly deferential." *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex.Cr.App.1990). Thus, this Court "must ascertain whether counsel's errors were so serious that counsel was not functioning in a manner envisioned by the Sixth Amendment." *Gosch v. State*, 829 S.W.2d 775, 784 (Tex.Cr.App.1991), (and cases cited therein). The burden is on appellant to show that his trial counsel did, in fact, render ineffective assistance of counsel and such a contention must be proven by a preponderance of the evidence. *Moore v. State*, 694 S.W.2d 528, 531 (Tex.Cr.App. 1985).

In point of error number nine, appellant alleges that his trial counsel was deficient based on repeated failures to object to improper jury argument. Specifically, appellant complains of five instances in which he contends that trial counsel failed to lodge proper and timely objections to improper jury argument by the State, four of which occurred at the argument on guilt/innocence and the fifth of which occurred at the argument on punishment. In these five complained-of incidences, the State argued the following:

[At guilt/innocence—]

1. You all know a crime was committed. Your sole decision now is who committed the offense, and I submit to you all of the evidence shows that the Defendant committed the crime that is charged.

2. Last time [the witness] sees [the victim] alive is 7:00 o'clock that evening, February 1st.

The next morning, the next day, however, you have to consider, she goes to work, she learns of the death of [the victim], but later on that day a little bit after the lunch hour the Defendants come in, and what is the first thing they ask her? Were the detectives asking about them. And you have to think, why would that be the first inquiry they make of [the witness.] Why? Because the evidence indicates that they are guilty. And you have to think back about it. [The victim] died at 3:00 o'clock in the morning and you know the paper had already been printed, so she is not in the morning paper.

3. And you have to think back additionally, regarding them going to the Police Department on 2–12–88, why not tell the police whatever it is you may or may not have known if you are not guilty, rather than spend one year and seven months in jail on an acquaintance? Doesn't make sense to be quiet like that, ladies and gentlemen, unless you have some involvement, unless you are guilty, and the evidence shows that.

4. And [the first prosecutor] argued his version, defense attorneys argued theirs, and I will submit to you from the reasonable inferences to be made from the facts in this case, that [the victim] either by use of the gun and/or the knives and getting the hell beat out of her first with fists, was forced to submit to the sexual assault and that the fur consistent with the fur on her jacket got all over that car because of the violent attack that it was.

[At punishment—]

5. Ladies and gentleman, you can't ignore what you've learned through your

lifetimes and you have to run the risk possibly, or do you really want to run the risk for your relatives, your son, your unborn child or your grandchildren if the Defendant gets a life sentence, if they ever come in contact, if they had the misfortune of going to prison, do you really want them to run the risk of coming into contact with the Defendant?

■ As we stated in point of error number eight, to constitute proper jury argument, the argument must encompass one of the following: 1) summation of the evidence presented at trial, 2) reasonable deduction(s) drawn from that evidence, 3) answer(s) to the opposing counsel's argument, or 4) a plea for law enforcement. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Cr.App.1988). The first and second arguments can easily be interpreted to be reasonable or common sense deductions drawn from the evidence presented at trial. Since they were each proper jury argument, there was no need for trial counsel to object. *See Mooney v. State*, 817 S.W.2d 693 (Tex.Cr.App.1991). Appellant has not met the first prong of *Strickland*.

■ In analyzing the third complained-of argument, we conclude that the failure to object was, in fact, outside reasonable professional norms. The record reveals that the offense occurred on February 1, 1988, while the trial did not begin until September, 1989—approximately one year and seven months apart. The only conceivable purpose of this argument was to impermissibly comment on appellant's post-arrest silence or his subsequent failure to testify. *See Sanchez v. State*, 707 S.W.2d 575 (Tex.Cr.App.1986). Clearly, appellant's trial counsel should have objected to this improper argument. However, while appellant has met the first prong of *Strickland* in this instance, he has not convinced this Court that his defense was prejudiced. *Strickland, supra.* The record reveals that the prosecutor would very consistently and very diligently speak about a certain piece of evidence and then would place it in a time context by saying "at that point in time." The context of most of his argu-

ment indicates that he was referring to the time of the offense or times prior to appellant's arrest. The statement about "one year and seven months" was not put into this context, but we cannot conclude from the totality of the argument. that it was perceived any differently. Furthermore, given the totality of trial counsel's representation of the accused, we cannot say that, absent this error, the outcome of the trial would have been different. Hence, appellant has not met the second prong of the *Strickland* test.

■ The failure of trial counsel to object to the fourth complained-of argument also does not constitute ineffective assistance of counsel. Appellant argues that a reference to a gun was a reference to an extraneous offense, and, failing to object to this was surely ineffective. Prior trial testimony established that a gun was found in appellant's car when it was searched.[13] Thus, the prosecutor's argument can be construed as an inferential deduction from the evidence presented at trial. It was also a proper response to defense counsel's prior argument that:

> You know, there was a pistol found in that car in this search. If this is drug related killing as [co-actor's girlfriend's] statement would have you believe, rather than a frenzy type killing that actually occurred, don't you think [appellant] would have taken his gun and disposed of [the victim.]

This argument clearly evidenced trial strategy on the part of appellant's trial counsel and the State's comment can be construed to be a proper response to this argument. *See Gaddis, supra.* The fact that another attorney might have pursued a different course of action does not necessarily indicate ineffective assistance. *Miniel,* 831 S.W.2d at 325.

■ The failure of trial counsel to object to the fifth complained-of argument is also without merit. This argument can be interpreted to be a proper plea for law enforcement and, as such, was not objec-

---

13. The legality of this search has not been con- tested on appeal.

tionable. *See Gaddis, supra.* Point of error number nine is overruled.

■ Appellant alleges in point of error number ten that his trial counsel rendered ineffective assistance because he requested the trial court not to charge the jury on the lesser included offense of murder. The record reveals that the trial court was, in fact, prepared to charge the jury on the lesser included offense. However, both the State and appellant requested that the lesser included charge be left out. The record also very clearly indicates that appellant, by his own sworn testimony, agreed with this strategy. As appellant received the request he made at trial, and as the record is devoid of evidence indicating that appellant was not cognizant of what he was agreeing to, we will not now entertain a complaint on the basis that his counsel was thus deficient on this point. *See Lasker v. State,* 573 S.W.2d 539, 543 (Tex.Cr.App. 1978). Point of error number ten is overruled.

In point of error number eleven, appellant maintains that his trial counsel was ineffective based on trial counsel's failure to object to hearsay statements allegedly made by the victim. Appellant specifically notes that, while other hearsay statements of the victim were offered and admitted elsewhere, he only complains of the admission of the following specific testimony elicited from the first officer that appeared on the scene, and the emergency room nurse who treated the victim:

> [THE OFFICER:] My first concern was to get her to tell me that she had been raped and stabbed, if that was what had happened.
>
> \* \* \* \* \* \*
>
> [THE STATE:] Do you remember what it was that you might first have said to her?
>
> [THE OFFICER:] I asked her, "What happened?"
>
> [THE STATE:] And how did she respond?

[THE OFFICER:] "They raped and stabbed me."

[THE STATE:] What did you next ask or did she say that you recall?

[THE OFFICER:] I asked her, "Who did this?"

[THE STATE:] And what response?

[THE OFFICER:] Her response to me was, "Two guys I met at the club."

[THE STATE:] Did you ask anything more?

[THE OFFICER:] Yes, I asked, "Were they white or black?"

[THE STATE:] And what was her response?

[THE OFFICER:] Her response was, "White."

\* \* \* \* \* \*

[THE STATE:] What did she tell you they had done, in her words that you recall?

[THE OFFICER:] She stated to me, "They raped and stabbed me."

[THE STATE:] And then you asked her what?

[THE OFFICER:] I asked her, "Who did this?"

[THE STATE:] And she responded?

[THE OFFICER:] "Two guys I met at the club in Fort Worth."

[THE STATE:] "The club"?

[THE·OFFICER:] (Witness nods.)

[THE STATE:] And then what?

[THE OFFICER:] I asked her what color they were and she said, "White."[14]

\* \* \* \* \* \*

[THE OFFICER:] As our conversation continued, I asked her again to tell me who did this and she repeated the same thing.

[THE STATE:] What was it that she repeated?

[THE OFFICER:] She repeated that two white males had—she had met at a club had done this to her.

[THE STATE:] All right. What else do you remember?

---

**14.** This answer drew an objection that the testimony was repetitious. The trial court sustained the objection "to the last question."

[THE OFFICER:] I—she made a statement that, "I thought I knew them but I guess I didn't."

[THE STATE:] What else do you remember?

[THE OFFICER:] She made the statement to me that, "I never met them before tonight."

\* \* \* \* \* \*

[THE STATE:] What else did you ask her?

[E.R. NURSE:] If she knew what had happened to her and she said, "Yes"; that she was raped and stabbed, and she answered "Yes" to both of these questions. And I asked her if she knew who did it and she responded, "Yes."

Appellant asserts that these statements were improperly admitted as "dying declarations" because the victim asked if she was going to die and, therefore, did not believe that death was imminent as is required under this exception to the hearsay rule. Tex.R.Crim.Evid. 804(b)(2). We need not address this contention, however, because we believe that the statements were properly admitted as "excited utterances" under Tex.R.Crim.Evid. 803(2).[15]

■ An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex.R.Crim.Evid. 803(2). While the period of time that lapsed between the occurrence of the startling event and the making of the statement is a factor to consider in determining the admissibility of such statements, the critical factor is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event. *Hawkins v. State,* 792 S.W.2d 491, 495 (Tex.App.—Houston [1st Dist.] 1990, no pet.); *Jones v.*

*State,* 772 S.W.2d 551, 555 (Tex.App.—Dallas 1989, *rev. ref'd* ).

■ Clearly, here, a startling event had occurred, as was evidenced by the 43 stab wounds and the 14 cuts and defensive wounds on the declarant's body. Though the time frame between the event and the statement was not conclusively established, it is apparent to this Court that the declarant was still under the emotional and physical stress of the assault when she made the statements of which appellant complains. *Hawkins, supra.* Lastly, each statement made *related to* the circumstances of the startling occurrence. *See Hawkins, supra; Torres v. State,* 807 S.W.2d 884, 887 (Tex.App.—Corpus Christi 1991, *pet. ref'd* ). The fact that some of the declarant's statements were in the form of responses to questions does not make them inadmissible under this exception to the hearsay rule. *Jones, supra.*

Since the failure of trial counsel to object to *admissible* [16] evidence does not constitute ineffective assistance of counsel [17], we conclude that appellant did not meet the first prong of the *Strickland* test. Point of error number eleven is overruled.

■ In point of error number twelve, appellant maintains that he was denied effective assistance of counsel when trial counsel, "through cross-examination, elicited previously unadmitted evidence of an extraneous offense." We believe that interjecting the evidence of the gun was trial strategy on the part of appellant's counsel. As counsel pointed out in argument at guilt/innocence, "[i]f this is drug [sic] related killing ... don't you think [appellant] would have taken his gun and disposed of [the victim]." But to employ this strategy, appellant's counsel had to mention the finding of the gun. The employment of such trial strategy does not support the finding of ineffective assistance of counsel. *See*

---

**15.** Although we are unaware of the legal basis upon which this testimony was admitted, if a trial judge's decision to admit certain testimony is correct on any theory of law applicable to the case, it will be upheld. This is true whether or not he states the correct ground. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Cr.App.1990).

**16.** Emphasis supplied by the author of the opinion unless otherwise indicated.

**17.** *See Gosch,* 829 S.W.2d at 784.

*Miniel, supra.* Point of error number twelve is overruled.

Appellant complains in point of error number seventeen that he was denied the effective assistance of counsel due to counsel's failure to present available mitigating evidence to the jury at the punishment stage of trial. The record reveals that the State rested after putting on its evidence at the punishment phase. Appellant's counsel then placed appellant on the stand and the following occurred outside the presence of the jury:

[DEFENSE COUNSEL:] [Defendant], do you understand we're at the punishment phase of this trial?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] And we have in preparation of punishment phase of this trial, talked at length to your mother and think you are aware of that.

\* \* \* \* \* \*

[DEFENSE COUNSEL:] And you know that we had [another witness] come up here on two occasions and talk to you; is that correct?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] And we have discussed with you what your mother would testify to today, as well as what [the other witness] would testify to.

[APPELLANT:] Yes, ma'am.

\* \* \* \* \* \*

[DEFENSE COUNSEL:] Are you going to allow us to put your mother and [the other witness] on the stand to testify to the matters that we have advised you?

[APPELLANT:] No, ma'am.

[DEFENSE COUNSEL:] Do you understand that if we are not allowed to put those people on the stand that you will not receive a charge that mitigates your punishment in this matter?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] Do you understand if we don't put them on, that we will rest immediately with no further testimony, and probably the only thing left to do is argue?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] And do you understand that [the other witness's] testimony would be that this very denial of wanting to put this on is consistent with what he says is a diagnosis?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] You also know that [co-defense counsel] and I have both, in talking with you, told you that it is our opinion and our advice and our counsel that you will allow us to put these two witnesses on?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] Do you know that—and we have told you that we expect [the other witness] to testify that as a child you were abused?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] By your father?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] And we expect your mother's testimony to bear that out?

[APPELLANT:] Yes.

[DEFENSE COUNSEL:] And you still will not, and in fact that is the reason you will not allow it to be entered; is that correct?

[APPELLANT:] Yes, ma'am.

[DEFENSE COUNSEL:] That's all we have.

\* \* \* \* \* \*

[THE COURT:] Son, do you realize at this point you've been convicted of capital murder and that there's only two punishments?

[APPELLANT:] Yes, sir. I will not subject them to any of that.

[THE COURT:] Well, do you understand that this may be a life or death decision?

[APPELLANT:] Yes, sir.

[THE COURT:] Now, I don't know all of the evidence, I only know in the most general terms what this evidence might be, but I have a great deal of faith in [the defense attorneys]. I think they are outstanding attorneys. [One defense attorney] has taught me some things on the way up and [the other] is one of the bright young attorneys in this case, but

attorney's advice is only good if you take it, and I am not going to tell you what decision to make but I want you to think very carefully about this because this could be—I am sure they have advised you as to what—all rights you have—but this could very well be a life or death decision.

[APPELLANT:] Yes.

[THE COURT:] And you still reject this testimony?

[APPELLANT:] Live or die, win, lose or draw, I couldn't live with that testimony out in public.

[THE COURT:] Well, you know, this is public for today.

[APPELLANT:] Subject them to public ridicule and humiliation, no.

After the jury was returned to the courtroom, the appellant then rested his punishment case without putting on any further evidence.

▬▬ It is clear to this Court from the foregoing testimony that appellant knew quite well the ramifications of his decision. As the Fifth Circuit stated in *United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990):

Cutting through the smoke, it is apparent that we are being asked to permit a defendant to avoid conviction on the ground that his lawyer did exactly what he asked him to do. That argument answers itself.

We agree with this statement. In *Strickland v. Washington*, the United States Supreme Court stated:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

466 U.S. at 691, 104 S.Ct. at 2066. When a defendant preempts his attorney's strategy by insisting that a different defense be followed or by insisting that certain evidence be put on or kept out, no claim of ineffectiveness can be sustained. *Duncan v. State*, 717 S.W.2d 345, 348 (Tex.Cr.App. 1986) (and cases cited therein). Point of error number twelve is overruled.

Considering all of the circumstances and the totality of defense counsel's representation of appellant, we conclude, under the *Strickland* test, that defense counsel rendered reasonably effective assistance.

In point of error number eighteen, appellant alleges that the "recurring misconduct of the prosecutors" constituted reversible error. In this point, he primarily argues that the misconduct occurred within the context of a long and difficult discovery process. However, appellant also alleges that such misconduct occurred as previously stated in points of error numbers four, eight, nine, twelve, thirteen, and fourteen. Given the resolution of the prior points, we will not again address them, but will instead only discuss this point in light of the alleged pre-trial discovery misconduct.

In regard to this alleged misconduct, appellant's argument seems to be that he was "denied his rights to due process, due course of law, and a fair trial, as guaranteed him by Article I, Sections 10 and 19 of the Texas Constitution, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." We begin our assessment of this issue by noting that appellant has not separated his federal and State arguments. *See Heitman v. State*, 815 S.W.2d 681 (Tex.Cr.App.1991).

Furthermore, appellant only cites *one* case in his entire argument on this point[18]. He does not specify whether the misconduct of which he complains involves exculpatory material[19] or whether it involves

---

**18.** Appellant cites *Stahl v. State*, 749 S.W.2d 826, 830 (Tex.Cr.App.1988).

**19.** Exculpatory material must be divulged by the State under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), where the evidence is material either to guilt or to punishment. Materiality is deter-

mined under *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) and *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This Court recently adopted the *Bagley* standards for exculpatory evidence and perjured testimony in *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex.Cr.App.1989).

some other type of information [20]. And most importantly, appellant simply makes a conclusory statement that he was harmed. He does not tell us how he was harmed nor does he cite us any authority on which to grant relief. We conclude that under Tex. R.App.Proc. 74(d) and (f), this point has not been adequately briefed as to any alleged discovery abuses. Therefore, we refuse to further address this point.

Finding no reversible error, we affirm the judgment of the trial court.

OVERSTREET and BENAVIDES, JJ., concur in the result.

CLINTON, J., dissents.

BAIRD, J., not participating.

---

**20.** Other information such as lost or destroyed evidence which may or may not be exculpatory. *See California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *Gardner v. State,* 745 S.W.2d 955 (Tex.App.—Austin 1988).