TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-97-00205-CR







Toby Longoria, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT


NO. 0964973, HONORABLE JON N. WISSER, JUDGE PRESIDING







 Appellant Toby Longoria was convicted of murder. Tex. Penal Code Ann. § 19.02
(West 1994). His punishment, enhanced by an affirmative finding that Longoria was an habitual
felony offender, was ordered by the trial court at fifty-six years imprisonment. Id. at § 12.42(d). 
We will affirm the judgment.


THE CONTROVERSY


 In August 1995, the body of a woman was found under the old Montopolis Bridge
where it crosses the Colorado River in Austin. The body was identified as that of Margaret Rose
Adams. Adams had lived in a small campsite under the bridge. Medical evidence indicated
Adams had been struck in the face with a blunt instrument that fractured her skull. While she was
on the ground, a heavy object was thrown on her head, possibly a rock. Blood was found at the
campsite under the bridge. 

 Investigators arrived at an opinion of what happened to Adams after she was
assaulted under the bridge. A trail of blood began under the bridge, where Adams was hit, and
led to the top of the bridge, where it ended in a smear of blood on a railing. Adams's body was
found in the river directly below the blood smear. Police found what looked like drag marks on
the ground under the bridge, and medical investigators found abrasions on Adams's lower body. 
The medical examiners concluded that after Adams had been hit she had been lifted by the arms
and dragged over a rough surface. A shopping cart was found in the river near the body. On the
paremont at the top of the bridge were found marks apparently made by narrow wheels. The trail
of blood curved with the path of the wheels and ended at the blood smear on the railing. The
railing was scraped. Police concluded that someone pulled Adams, took her to the top of the
bridge, put her in a shopping cart, wheeled her onto the bridge, and cast her over the railing and
into the river. A medical examiner concluded that the causes of death were a skull fracture and
drowning.

 A local resident who regularly jogged past Adams's campsite testified that Adams
had lived there for at least six months. He thought she was the only person who lived there. He
had seen the campsite a few times and been surprised how neat and tidy it was. He brought the
police to the campsite after the murder. Adams's pots and pans, Bible, clothing, newspapers, and
bedding were strewn around the area. The jogger identified a straw hat at the campsite as one
worn by Adams.

 Investigators found the words "Gato Negro," a roman numeral "VII," and a
backwards numeral seven spray-painted under the bridge. This graffiti was found on both sides
of the girder that supported the "ceiling" or overhead of Adams's sleeping area. Additional
graffiti appeared on the bridge; "Gato Negro" was painted on top of the other graffiti, leading
investigators to conclude it was the most recent. Another spray-painted "seven" was found on the
bridge railing near where Adams had apparently been cast over the railing and into the river. 

 Appellant Toby Longoria's mother lived in a house located about one hundred yards
from the murder scene. According to police files, Longoria was known on the street as "Gato
Negro." Police records indicated that Longoria was associated with a gang known as the
"seventh-street gang." Police arrested Longoria at his mother's house on an outstanding forgery
warrant. After further investigation, Longoria was indicted for Adams's murder.

 At trial the prosecution's evidence consisted primarily of the physical evidence
previously described and the testimony of several of Longoria's friends. The testimony concerned
statements made by Longoria, about two weeks after the murder, in which Longoria spoke of
killing a woman under the Montopolis bridge. We will summarize the testimony.

 Joe Esparza, a long-time friend of Longoria, told police that Longoria had visited
him one afternoon about two weeks after the murder. Esparza testified Longoria told him he had
been spray-painting under the bridge when a woman approached him and told him to stop painting,
and Longoria said he "swung" at the lady. 

 Longoria spoke afterwards at a party to several friends about the incident. Louis
Arispe testified that while at the party he heard Longoria say he killed a woman and threw her "in
the lake." Jesse Hernandez, another friend, testified he heard Longoria say he had been spray-painting under the bridge when a woman told him to leave because "it was her little house or
something." Longoria said he got angry with the woman and hit her with a "can" and was
"dragging her around." Finally, Hernandez heard Longoria say he threw the woman off the
bridge, and that her body made a "big old swish" when it hit the water. Victor Coronado testified
he heard Longoria say that he "messed a woman up" and "choked" her. In their testimony,
however, Esparza and Arispe both added that Longoria had a reputation for bragging. 

 In addition to testifying about Longoria's inculpatory statements, Esparza and
Arispe verified that Longoria used the nickname "Gato Negro." Arispe had seen Longoria's name
spray-painted around East Austin. (1) Esparza also testified that Longoria was a member of the
"seventh-street gang," a gang whose "tag" was a number seven or a roman numeral seven. 
Esparza had seen Longoria spray-paint numeral sevens like the ones found on the bridge. 

 On the basis of the foregoing evidence, a jury convicted Longoria of the murder. 
He now appeals, contending in two points of error that the evidence was neither legally nor
factually sufficient to support his conviction.


DISCUSSION AND HOLDINGS


 When reviewing the legal sufficiency of the evidence, we view it in the light most
favorable to the verdict and determine whether any rational trier of fact could have found the
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); 
Griffin v. State, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981). When reviewing the factual
sufficiency of the evidence, we view all the evidence without that prism and set aside the verdict
only if it is so against the weight of the evidence as to be clearly unjust. Cain v. State, 958
S.W.2d 404, 406-408 (Tex. Crim. App. 1997) (citing Clewis v. State, 922 S.W.2d 126, 129 (Tex.
Crim. App.1996)). The court should be appropriately deferential in order to avoid substituting
its own judgment for that of the fact-finder. See Clewis, 922 S.W.2d at 134-35; Stone v. State,
823 S.W.2d 375, 381 (Tex. App.--Austin 1992, pet. ref'd untimely filed). The court is
authorized to set aside the jury's determination, even if supported by some probative evidence,
when the jury finding is "manifestly unjust." Jones v. State, 944 S.W.2d 642, 647-48 (Tex. Crim.
App. 1996).

 The evidence here is unusual because aside from the evidence of the spray-painted
words and numbers, little directly connects Longoria to Adam's death other than the statements
he made to his friends. Nevertheless, we believe the evidence shows a very strong concurrence
of the physical circumstances of the murder, Longoria's statements, and matters proved about him. 
Considered together, these sufficiently support the conviction. 

 Longoria admitted at a party that he had killed a woman. Longoria said he
"swung" at a woman under the bridge, and hit her with a can. The medical and other physical
evidence showed that Adams had, indeed, been struck under the bridge by a blunt instrument. 
Longoria revealed by his statements his knowledge that after the woman was assaulted, she was
taken to the top of the bridge and cast into the river--a highly unusual event. He told friends he
"dragged" the woman, a statement consistent with the drag marks found under the bridge and the
abrasions found on Adams's lower body. Longoria's rather detailed description of events
coincides exactly with the physical evidence found under the bridge, on top of the bridge, and on
Adams's body.

 Longoria's attorney attempted to diminish the effect of Longoria's inculpatory
statements by emphasizing the witnesses' testimony that Longoria was a known braggart. (2) As
stated previously, we may not substitute our own judgment for that of the fact-finder. See Clewis,
922 S.W.2d at 134-35. Under the circumstances, the jury reasonably could have concluded that
Longoria's statements were nothing more than bravado; and the jury reasonably could have
disbelieved that theory, concluding such testimony was given by the reluctant witnesses to protect
Longoria. (3) That the jury evidently made the latter conclusion is fully justified under the evidence.

 In addition to the coinciding factors just described, other circumstantial evidence
corroborates Longoria's inculpatory statements. Longoria used the street name "Gato Negro." 
 The words "Gato Negro" were the freshest words painted on the bridge, found under the bridge
where the first blood stain was found. The defense emphasized that other people might use the
street name "Gato Negro," precluding a sound conclusion that Longoria and no one else had
"tagged" the bridge. The graffiti did, however, constitute circumstantial evidence of Longoria's
guilt. The number seven, shown to signify Longoria's gang, was painted both near Adams's bed
and atop the bridge at the spot where Adams's body was thrown into the river. 

 The defense attempted to persuade the jury that the acts depicted by the prosecution
could not be accomplished by one person acting alone. Although there were drag marks under the
bridge where someone probably pulled Adams across the ground, there were no marks up the
steep slope to the top of the bridge. Longoria's counsel argued that a man of Longoria's size
could not by himself carry a 130-pound woman up the slope without dragging her. We do not
believe the jury was required to draw the conclusion suggested by counsel; they may well have
concluded that Longoria had the strength to carry a small woman, estimated to be between five-foot-one and five-foot-three in stature, up the incline to the bridge.

 Given the combined effect of Longoria's exceptional knowledge (revealed in his
statements to friends) of the specific physical details of the assault and murder, combined with the
circumstantial evidence of the spray-painted words that match Longoria's nickname and gang
affiliation, we conclude the evidence was neither legally insufficient to support the jury verdict nor
was the verdict so against the weight of the evidence as to be clearly unjust.

 We affirm the judgment of the trial-court.



 

 John Powers, Justice

Before Justices Powers, Kidd and B. A. Smith

Affirmed

Filed: September 11, 1998

Do Not Publish
1. Arispe did not make clear whether he had seen the name "Gato Negro" or some other name
associated with Longoria spray-painted around town.
2. Longoria's incriminating statements are best classified as statements against penal interest. 
Statements tending to expose a defendant to criminal liability are not admissible unless
corroborating circumstances clearly indicate the trustworthiness of the statements. McFarland v.
State, 845 S.W.2d 824, 835 (Tex. Crim. App. 1992); Tex. R. Evid. 803(24). Longoria does not
complain that the statements were erroneously admitted.
3. Esparza admitted, however, that Longoria had never before bragged about a murder. And
Arispe stated that despite Longoria's reputation for bragging and "being psychotic," Arispe "kind
of figured [Longoria] was the one . . . ." 


 All of Longoria's friends expressed that they were in court against their will.



the
abrasions found on Adams's lower body. Longoria's rather detailed description of events
coincides exactly with the physical evidence found under the bridge, on top of the bridge, and on
Adams's body.

 Longoria's attorney attempted to diminish the effect of Longoria's inculpatory
statements by emphasizing the witnesses' testimony that Longoria was a known braggart. (2) As
stated previously, we may not substitute our own judgment for that of the fact-finder. See Clewis,
922 S.W.2d at 134-35. Under the circumstances, the jury reasonably could have concluded that
Longoria's statements were nothing more than bravado; and the jury reasonably could have
disbelieved that theory, concluding such testimony was given by the reluctant witnesses to protect
Longoria. (3) That the jury evidently made the latter conclusion is fully justified under the evidence.

 In addition to the coinciding factors just described, other circumstantial evidence
corroborates Longoria's inculpatory statements. Longoria used the street name "Gato Negro." 
 The words "Gato Negro" were the freshest words painted on the bridge, found under the bridge
where the first blood stain was found. The defense emphasized that other people might use the
street name "Gato Negro," precluding a sound conclusion that Longoria and no one else had
"tagged" the bridge. The graffiti did, however, constitute circumstantial evidence of Longoria's
guilt. The number seven, shown to signify Longoria's gang, was painted both near Adams's bed
and atop the bridge at the spot where Adams's body was thrown into the river. 

 The defense attempted to persuade the jury that the acts depicted by the prosecution
could not be accomplished by one person acting alone. Although there were drag marks under the
bridge where someone probably pulled Adams across the ground, there were no marks up the
steep slope to the top of the bridge. Longoria's counsel argued that a man of Longoria's size
could not by himself carry a 130-pound woman up the slope without dragging her. We do not
believe the jury was required to draw the conclusion suggested by counsel; they may well have
concluded that Longoria had the strength to carry a small woman, estimated to be between five-foot-one and five-foot-three in stature, up the incline to the bridge.

 Given the combined effect of Longoria's exceptional knowledge (revealed in his
statements to friends) of the specific physical details of the assault and murder, combined with the
circumstantial evidence of the spray-painted words that match Longoria's nickname and gang
affiliation, we conclude the evidence was neither legally insufficient to support the jury verdict nor
was the verdict so against the weight of the evidence as to be clearly unjust.

 We affirm the judgment of the trial-court.



 

 John Powers, Justice

Before Justices Powers, Kidd and B. A. Smith

Affirmed

Filed: September 11, 1998

Do Not Publish
1. Arispe did not make clear whether he had seen the name "Gato Negro" or some other name
associated with Longoria spray-painted aroun