IN THE COURT OF CRIMINAL APPEALS


OF TEXAS
 





NO. PD-325-05




 


TREVER ORANDE ROBERTSON, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE TENTH COURT OF APPEALS


LIMESTONE COUNTY





 Hervey, J., delivered the opinion for a unanimous Court. 



O P I N I O N 



 This is an ineffective-assistance of counsel case. We granted discretionary review to decide
whether, as a matter of federal constitutional law, appellant's trial lawyer performed deficiently for
eliciting testimony from appellant at the guilt phase of his trial that appellant was already
incarcerated on two convictions that were pending on appeal. (1)

 Appellant was charged in this case with aggravated assault. In exchange for appellant's
guilty plea to this charge, the State initially offered to recommend a ten-year sentence to be served
concurrently with a fifteen-year sentence that appellant was serving on one of the convictions then
pending on appeal. The record of an in camera hearing just prior to voir dire on the aggravated
assault charge reflects:

 Q. [APPELLANT'S TRIAL LAWYER]: Trever, you and I have talked about, at the
Gurney Unit in Palestine, here in Groesbeck, and then again this morning, the plea
offer that the DA's office has offered you, have we not?


 A. [APPELLANT]: Yes, sir.


 Q. And I've told you that their offer was for ten years to do in TDC.


 A. Yes, sir.


 Q. With a finding of a deadly weapon.


 A. Yes, sir.


 Q. And would that sentence, if the judge were to approve it, that the sentence would
run concurrent alongside of the [fifteen-year] sentence you're currently serving out
of Freestone County, is that correct?


 A. Yes, sir.


 Q. And you have told me that you are not interested in a plea bargain, is that correct?


 A. Yes, sir.


 Q. And you don't want to plea; you want a jury trial. Is that correct?


 A. Yes.


 Q. And you understand that you won't have another opportunity to-you can't change
your mind later on.


 A. Yes, sir, I understand.


 Q. So, after we start now, and at this time you're electing that, if you're found guilty,
for the jury to assess punishment, is that correct?


 A. Yes, sir.


 Q. And so, now, you may have the opportunity later on to change your mind on that,
but you won't have the opportunity to change your mind about the plea, you
understand?


 A. Yes, sir.


 Q. And you had told me this morning that you had confidence that your attorney had
a good chance to overturn the Freestone County case and for you to win your appeal,
is that correct?


 A. Yes, sir.


 Q. And I told you that I had talked to your attorney perfecting the appeal, and he was
not confident at all that you would win. I told you that, didn't I?


 A. Yes, sir.


 Q. But, yet, you don't want to do the plea.


 A. No, sir.


 Q. And you understand that, in all likelihood, if the-it's nearly a guarantee, if you're
found guilty, that any sentence the jury or the judge may give you would be stacked
on top of whatever you may or may not have in Freestone County.


 A. Yes, sir.


 Q. Okay. And knowing all of that, you foresee us to go forward with the jury trial?


 A. Yes, sir.


 Appellant went to trial on the aggravated assault charge in May 2003. Rejecting appellant's
self-defense claim, a jury convicted appellant of this offense and sentenced him to fourteen years in
prison. The evidence at trial shows that appellant stabbed the victim with a knife in the parking lot
of a motel after the victim pushed or hit appellant in the face. (2) Appellant initially told the police
shortly after the incident that the victim and another person (Berry) came into his motel room in a
"loud" manner and attacked him. Appellant did not mention in this statement that he stabbed the
victim or that he was ever in the parking lot of the motel. Appellant contradicted his initial statement
to the police when he testified at trial that he stabbed the victim in self-defense in the parking lot of
the motel. Appellant also testified at trial that he called 911 immediately after the incident. Police
department 911 records, however, did not support this.

 Primarily through his cross-examination of the State's witnesses, appellant's trial lawyer
elicited testimony that could have explained most, if not all, the inconsistencies between appellant's
initial statement to the police and his trial testimony. Appellant's trial lawyer also elicited testimony
from which the jury could have found that the victim was a violent, weapon-carrying, drug-user who
had assaulted appellant in the past. And, during his recross-examination of the victim, appellant's
trial lawyer was able to reveal that the victim had a pocket knife in his shirt pocket while he was
testifying at appellant's trial. On later cross-examination of the victim, appellant's trial lawyer
elicited more testimony from the victim in which the victim claimed that he had never "carried any
kind of knife all [his] life."

 At the beginning of his direct examination of appellant, appellant's trial lawyer questioned
appellant about his current incarceration on the two convictions pending on appeal. See also
Robertson, slip op. at 3 (appellant's trial lawyer elicited testimony from appellant that appellant "was
currently incarcerated, that he had been convicted in two cases for possession of cocaine and
possession of methamphetamine, and that he was in possession of a knife at the time of the arrests").

 Q. [APPELLANT'S TRIAL LAWYER]: [Appellant], if you would now, I want to
ask you to answer the questions loud enough that the court reporter can hear your
answers, the judge can hear your answers, I can hear your answers, and probably
most important, that the jury can hear your answers. So try to answer clear and
precise, and try to answer the question that's asked.


 For the record, please state your full name.


 A. [APPELLANT]: My name is Trever Orande Robertson.


 Q. And how do you pronounce your middle name?


 A. Orande.


 Q. Orande?


 A. Yeah.


 Q. And how old are you?


 A. I'm 25.


 Q. And currently, are you incarcerated in TDC?


 A. Yes, sir, I am.


 Q. And since when have you been there?


 A. I've been there since May the 21st. I mean, October 21st.


 Q. October the 21st of 2002?


 A. Yes, sir.


 Q. Now, is that on a sentence out of Freestone County?


 A. Yes, sir.


 Q. And did you-the jury found you guilty; is that correct?


 A. Yes, sir.


 Q. And you're currently got that decision under appeal; is that correct?


 A. Yes, sir.


 Q. Because you disagree with some of the things-how they that transpired in court;
is that correct?


 A. Yes, sir.


 Q. Now, was the sentence there for fifteen years?


 A. Yes, sir.


 Q. Okay. And in addition, when you were arrested in Freestone County, did they find
a switch blade on your person, on you?


 A. Yes, sir.


 Q. You hadn't used the knife on anybody?


 A. No, sir.


 Q. You didn't use it on the police?


 A. No, sir.


 Q. And not on nobody [sic] else; is that correct?


 A. Yes, sir.


 Q. But it was on-it was either on your person or in your things; is that correct?


 A. Yes, sir.


 Q. And so they had a finding of a deadly weapon on that charge; is that correct?


 A. Yes, sir.


 Q. Okay, in addition to that, had you had a prior conviction either in Freestone or
Limestone or someplace where you were on probation for possession for some type
of illegal substance?


 A. Yes, sir.


 Q. And tied in with the conviction in Freestone County, did you subsequently or
possibly prior to that trial date get your probation revoked and get sentenced on that
case?


 A. Yes, sir.


 Q. And do you know what the sentence was on that case?


 A. They ran it concurrent with-with the fifteen years.


 Q. But do you know for how many years?


 A. Two.


 Q. Two years?


 A. Yes.


 Q. So it was like a state jail fine?


 A. Yes, sir.


 Q. But it's running concurrent with the fifteen years. So you've actually got two
sentences that you're serving time on right now; is that correct?


 A. Yes, sir.

 

 This questioning opened the door to some damaging cross-examination by the prosecution,
which also referred to appellant's two convictions during its closing jury arguments. (3) Appellant's
trial lawyer argued to the jury that appellant was afraid of the victim and that he acted in self-defense.

 Now, [the victim] sat there on the stand, said that prior to his girlfriend giving him
his current knife that he had in his pocket-by the way, y'all saw him open it and just
kind of slide that thing up and flip that thing open. It didn't look like the first time
he had ever done that. Might have been. We don't know.


 But when I asked him right there, had he ever carried a knife, no, he'd never carried
any kind of a knife, not even when he was a boy, not to go fishing. But Neva
Coleman said she had seen him with a gun, she had seen him with a knife in the past. 
Not each and every time she had seen him, but he had been known to carry weapons
with him and on his person. He's a known drug dealer. But, again, [the victim] said
he never carried a knife.


 [Appellant] knew [the victim] also. When they start the fight, [the victim] hits
[appellant], the fight starts. He testifies that Berry grabs an arm, but he's already
gotten a hand in his pocket, got his knife out, Berry grabs his arm, he comes back, he
gets his knife open, he stabs him.


 He says he was in fear of being hurt by [the victim]. He is in fear. What he knows,
in November he calls the police on [the victim]. He-now whether [appellant] is
bigger than [the victim] is irrelevant. Fear is fear. Evidently [the victim] may be
tougher. He certainly looks like he's in better condition. So this is the thing that you
all are going-one of the things you'll have to decide is who do you believe in this?

 

 Appellant's trial lawyer did mention appellant's current incarceration on the two convictions
during the very end of his closing jury arguments.

 So we ask after considering all the testimony from the witness stand, considering [the
State's] and myself's closing arguments, that you do the right thing in this case and
vote not guilty in this case. [Appellant] is already in TDC serving a fifteen-year
sentence. But in this case, not guilty. Thank you.


 After he was convicted and sentenced, appellant filed a pro se motion for new trial. 
Appellant alleged in paragraph III of this motion that he felt "mislead by his State appointed
Counsel. Due to it being a matter of self defense in his own room." (4) Paragraph III of appellant's pro
se motion for new trial did not expressly allege that his trial lawyer was ineffective for eliciting the
testimony from appellant about his incarceration on the two convictions. The trial court initially
denied a request by appellant's newly appointed appellate lawyer to present evidence on this claim
at the hearing on the motion for new trial because "the alleged misleading [in paragraph III of
appellant's pro se motion for new trial did] not relate to the issue of improperly submitting an
extraneous offense." The trial court permitted appellant's newly appointed appellate lawyer to make
a bill of exception on this ineffective assistance of counsel claim.

 In relevant part, appellant's trial lawyer testified on direct examination during this bill of
exception that he decided to elicit the testimony from appellant about appellant's incarceration on
the two convictions.

 Q. And, on occasion, in Limestone County, were you appointed to defend
[appellant]?


 A. I was.


 Q. And that was on aggravated assault indicates [sic], is that correct?


 A. I believe that's correct.


 Q. This matter proceeded to trial?


 A. Yes.


 Q. And it's my understanding that, several times during the trial, you went on the
record at some point and stated that you felt that the case probably should have been
handled by a plea bargain at some point. Would that be correct?[ (5)]


 A. That is correct.


 Q. And was it also your understanding, at the time, that this-that your aggravated
assault case was going on that he had been convicted in the 87th District Court, I
believe, here in Freestone County.


 A. That's correct.


 Q. And that matter was a possession with intent to distribute a controlled substance,
your recollection?


 A. I'm not sure what the conviction was. I understand that [appellant] went to the
jury and the jury found him guilty.

* * *

 Q. To your recollection, Mr. Tate, was that case on appeal at the time that your case
was being tried in Limestone County?


 A. Yes, it was.


 Q. And during the trial, [appellant] chose to take the witness stand, is that correct?


 A. That's correct.


 Q. And was it your decision to educe, or bring out, the fact that he had been
convicted in Freestone County of any felony charge?


 A. It was.


 Q. And, again, that was still on appeal at the time.


 A. It's my understanding, yes.


 [APPELLATE LAWYER]: No, further questions, Your Honor.


 On cross-examination, appellant's trial lawyer testified that he and appellant decided to
inform the jury about appellant's two convictions as part of a trial strategy to convince the jury that
appellant was not a liar.

 Q. [STATE]: [Appellant] in fact wanted-he demanded he be allowed to testify in this
case, didn't he?


 A. [TRIAL LAWYER]: Yes, he did. And we talked about whether to bring it [the
two convictions] up. And trial strategy at that time, I guess, I recommended that-that
we tell the jury that there was a conviction out of Freestone County.


 Q. One of the important things, with respect to trying to defend [appellant] on the
self-defense theory, was trying to convince the jury he was up there telling the truth,
wasn't it?


 A. Yes.


 Q. So, as part of your trial strategy, you felt it was appropriate to have [appellant] let
the jury know about this case.


 A. Yes.[ (6)]


 On redirect examination, appellant's trial lawyer testified that he was "now aware" that Tex.
R. Evid. 609 would not have allowed the State to impeach appellant with the convictions that were
pending on appeal. (7) The trial court changed its earlier ruling, and decided that appellant could
pursue his ineffective assistance of counsel claim "during his Motion For New Trial" because the
term "misled" is "very general" and it was "conceivable that [appellant] raised the issue of
ineffective assistance of counsel under paragraph III [of his pro se motion for new trial]." The trial
court ultimately denied appellant's motion for new trial and found that the "decision to inform the
jury of the extraneous offense was a matter of trial strategy."

 On direct appeal, the Court of Appeals decided that the actions of appellant's trial lawyer in
introducing the evidence of appellant's incarceration on the two convictions was a sound trial
strategy "of convincing the jury that [appellant] was telling the truth, and thereby convince the jury
to believe [appellant's] self-defense claim." Robertson, slip op. at 4. We granted review. The
ground upon which we granted review states:

 Is the impeachment of a defendant by defense counsel with an inadmissible
conviction "deficient" behavior under a Strickland v. Washington analysis?[ (8)]


 In Strickland, the Supreme Court stated that a lawyer's obligation "to assist the defendant"
includes duties "to consult with the defendant" and "to bring to bear such skill and knowledge as will
render the trial a reliable adversarial testing process." See Strickland, 466 U.S. at 688. The Court
in Strickland, 466 U.S. at 688-90, further stated:

 These basic duties neither exhaustively define the obligations of counsel nor form a
checklist for judicial evaluation of attorney performance. In any case presenting an
ineffectiveness claim, the performance inquiry must be whether counsel's assistance
was reasonable considering all the circumstances. Prevailing norms of practice as
reflected in American Bar Association standards and the like, (citation omitted), are
guides to determining what is reasonable, but they are only guides. No particular set
of detailed rules for counsel's conduct can satisfactorily take account of the variety
of circumstances faced by defense counsel or the range of legitimate decisions
regarding how best to represent a criminal defendant. Any such set of rules would
interfere with the constitutionally protected independence of counsel and restrict the
wide latitude counsel must have in making tactical decisions. (Citation omitted). 
Indeed, the existence of detailed guidelines for representation could distract counsel
from the overriding mission of vigorous advocacy of the defendant's cause. 
Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment
is not to improve the quality of legal representation, although that is a goal of
considerable importance to the legal system. The purpose is simply to ensure that
criminal defendants receive a fair trial.


 Judicial scrutiny of counsel's performance must be highly deferential. It is all too
tempting for a defendant to second-guess counsel's assistance after conviction or
adverse sentence, and it is all to easy for a court, examining counsel's defense after
it has proved unsuccessful, to conclude that a particular act or omission of counsel
was unreasonable. (Citation omitted). A fair assessment of attorney performance
requires that every effort be made to eliminate the distorting effects of hindsight, to
reconstruct the circumstances of counsel's challenged conduct, and to evaluate the
conduct from counsel's perspective at the time. Because of the difficulties inherent
in making the evaluation, a court must indulge a strong presumption that counsel's
conduct falls within the wide range of reasonable professional assistance; that is, the
defendant must overcome the presumption that, under the circumstances, the
challenged action "might be considered sound trial strategy." (Citation omitted). 
There are countless ways to provide effective assistance in any given case. Even the
best criminal defense attorneys would not defend a particular client in the same way. 
(Citation omitted).


 The availability of intrusive post-trial inquiry into attorney performance or of detailed
guidelines for its evaluation would encourage the proliferation of ineffectiveness
challenges. Criminal trials resolved unfavorably to the defendant would increasingly
come to be followed by a second trial, this one of counsel's unsuccessful defense. 
Counsel's performance and even willingness to serve could be adversely affected. 
Intrusive scrutiny of counsel and rigid requirements for acceptable assistance could
dampen the ardor and impair the independence of defense counsel, discourage the
acceptance of assigned cases, and undermine the trust between attorney and client.


 Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness
of counsel's challenged conduct on the facts of the particular case, viewed as of the
time of counsel's conduct. A convicted defendant making a claim of ineffective
assistance must identify the acts or omissions of counsel that are alleged not to have
been the result of reasonable professional judgment. The court must then determine
whether, in light of all the circumstances, the identified acts or omissions were
outside the wide range of professionally competent assistance. In making that
determination, the court should keep in mind that counsel's function, as elaborated
in prevailing professional norms, is to make the adversarial testing process work in
the particular case. At the same time, the court should recognize that counsel is
strongly presumed to have rendered adequate assistance and made all significant
decisions in the exercise of reasonable professional judgment.

 

 Our case law states that it is the defendant's burden to prove by a preponderance of the
evidence that trial counsel's performance was deficient or not "reasonably effective" by showing that
counsel's performance fell below an objective standard of reasonableness based on prevailing
professional norms. See Rylander v. State, 101 S.W.3d 107, 109-110 (Tex.Cr.App. 2003);
McFarland v. State, 845 S.W.2d 824, 842 (Tex.Cr.App. 1992), cert. denied, 508 U.S. 963 (1993);
Ingham v. State, 679 S.W.2d 503, 509 (Tex.Cr.App. 1984). The "right to effective assistance of
counsel merely ensures the right to reasonably effective [not perfect] assistance." See id. This right
does not mean errorless or perfect counsel whose competency of representation is to be judged by
hindsight. See McFarland, 845 S.W.2d at 843, Ingham, 679 S.W.2d at 509.

 "Isolated instances in the record reflecting errors of omission or commission do not render
counsel's performance ineffective, nor can ineffective assistance of counsel be established by
isolating one portion of trial counsel's performance for examination." McFarland, 845 S.W.2d at
843. Counsel's performance is judged by "the totality of the representation" and, "judicial scrutiny
of counsel's performance must be highly deferential" with every effort made to eliminate the
distorting effects of hindsight. See id.; Ingham, 679 S.W.2d at 509. The Supreme Court in
Strickland cautioned that intrusive post-trial inquiry into attorney performance should be avoided
because that would encourage the proliferation of ineffectiveness challenges. See Strickland, 466
U.S. at 690. (9)

 Initially, we note that the record in this case does not support a finding that appellant's trial
lawyer elicited the testimony of appellant's incarceration on the two convictions because he thought
the prosecution could use this information to impeach appellant. (10) And, assuming counsel's
challenged action, though strategic, could not be considered soundly strategic, (11) that would not
necessarily establish that trial counsel performed deficiently under the first prong of Strickland
because counsel's performance must be judged by the totality of the representation. See McFarland,
845 S.W.2d at 843.

 In this case, appellant's trial lawyer testified that he elicited the evidence of appellant's
incarceration on the two convictions after consulting with appellant. See Strickland, 104 S.Ct. at 688
(counsel has duty to consult with defendant on important decisions). And, we may presume that
appellant's trial lawyer fully explained to appellant the possible consequences of bringing out this
information. See Strickland, 466 U.S. at 689 (courts must indulge strong presumption that counsel's
conduct falls within the wide range of reasonable professional assistance). (12) We further note that
appellant's trial lawyer, primarily through his cross-examination of the State's witnesses, made a
case for self-defense.

 Even though the performance of appellant's trial lawyer may not have been perfect, the
assistance that he did provide arguably was reasonably effective under the particular circumstances
of this case. See Ingham, 679 S.W.2d at 509 (right to effective assistance of counsel merely ensures
the right to reasonably effective, not perfect, assistance). On this record, it is fairly debatable
whether counsel's performance rendered the trial an unreliable adversarial testing process and
deprived appellant of a fair trial. See Strickland, 466 U.S. at 689 ("the purpose of the effective
assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation,
although that is a goal of considerable importance to the legal system. The purpose is simply to
ensure that criminal defendants receive a fair trial"); Chandler, slip op. at 4 n.6.

 Nevertheless, in cases like this where appellant's self-defense claim rested almost entirely
on his credibility, the weight of authority supports a holding that appellant's trial lawyer performed
deficiently under the first prong of Strickland by allowing the jury to hear prejudicial and clearly
inadmissible evidence because this evidence could serve no strategic value including demonstrating
that appellant is not a liar. See Ex parte Menchaca, 854 S.W.2d 128, 131-33 (Tex.Cr.App. 1993)
(there could be no strategic basis for allowing the jury to hear that defendant previously had been
convicted of the same offense for which he stood trial); (13) see also Harding v. Sternes, 380 F.3d 1034,
1043-45 (7th Cir. 2004), cert. denied, 73 U.S.L.W. (2005); Lyons v. McCotter, 770 F.2d 529, 532-35
(5th Cir. 1985) cited in this Court's decision in Menchaca, 854 S.W.2d at 132; Moore, 715 A.2d at
451-52; State v. Hawthorne, 431 N.W.2d 630, 636 (Neb. 1988); Commonwealth v. Candia, 428 A.2d
993, 996 (Pa. Super. Ct. 1981). The State cites no contrary authority directly on point and our
independent research has not found any either. (14)

 The Court's discussion in Candia, which was decided prior to Strickland but which applied
essentially the attorney performance standard discussed in Strickland, illustrates this case law. The
Court's opinion in Candia, 428 A.2d at 996, states:

 Candia charges that his [trial] counsel improperly extracted testimony from
him-regarding previous crimes-which subjected him to Commonwealth questioning
which drew his character into disrepute. Candia answered [trial] counsel's questions
with the understanding that their purpose was to cause Candia to demonstrate his
honest recollections of past criminal acts. In this fashion, appellant was to prove
himself credible. Appellant, however, was subjected to cross-examination which
ridiculed his character with the introduction of his past drug-related criminal activity. 
Appellant's counsel objected strenuously but to no avail. The trial court permitted
the Commonwealth's line of questioning.

 

 The Court's opinion in Candia, 428 A.2d at 996, decided that Candia's trial counsel
performed deficiently:

 Furthermore, the testimony elicited on direct examination opened the door to cross-examination on Candia's previous crimes. Trial counsel's strategy in seeking this
testimony was grossly inappropriate for the purposes he sought to achieve. The right
to full cross-examination which does not go beyond the scope of direct examination
is guaranteed. (Citation omitted). Trial counsel's decision to question the appellant
about his past criminal acts served only to invite very damaging cross-examination
by the Commonwealth.


 Certainly [an effective trial counsel] would not have placed Candia on the stand
under a theory so tenuous as to believe admission of previous criminal acts would
demonstrate credibility. Even if so incredible a theory were possible, no reasonable
strategy would follow which included the invitation to the Commonwealth to use
evidence of previous convictions against the appellant.


 We decide that appellant's trial lawyer performed deficiently under the first prong of
Strickland for eliciting testimony from appellant at the guilt phase of his trial that appellant was
already incarcerated on two convictions that were pending on appeal. It is, therefore, necessary to
consider whether this deficient performance was prejudicial under the second prong of Strickland. 

 The judgment of the Court of Appeals is reversed, and the cause is remanded there for further
proceedings consistent with this opinion.

 Hervey, J.


Filed: March 22, 2006

Publish

1. This case concerns only the first prong of the two-pronged federal constitutional ineffective
assistance of counsel test. See Strickland v. Washington, 466 U.S. 668, 694 (1984) (to establish
ineffective assistance of counsel, a defendant must establish deficient performance and prejudice).
2. The facts from the opinion of the Court of Appeals show:


 The alleged victim, Manual Bluitt, testified that he and Michael Berry went to
[appellant's] motel room to retrieve some compact discs and clothing that [appellant]
had borrowed. [Appellant] and a lady friend testified that they were engaging in
sexual activity in the room when Bluitt and Berry knocked repeatedly on the door. 
[Appellant] testified that after a verbal argument with the two, he agreed to go
downstairs to get the compact discs and clothing out of the car. He also testified that
Bluitt wanted him to accompany Bluitt to get some [drugs] and that he refused. 
Bluitt testified that once the three men were in the parking lot, [appellant] refused to
give Bluitt and Berry their belongings and continued to argue with them. Bluitt
testified that he pushed [appellant] in the face with his open hand, that [appellant] fell
back laughing, and that [appellant] then stabbed him with a knife. [Appellant]
testified that Bluitt hit him in the face, that they "tussled," that Berry held one of his
arms, and that he pulled out his knife and stabbed Bluitt.


Robertson v. State, No. 10-03-00265-CR, slip op. at 1-2 (Tex.App.-Waco, delivered November 10,
2004) (not designated for publication). 
3. In his brief on discretionary review, appellant characterizes this as the State "dumping salt
into the wounds inflicted by his own counsel." For example, the State argued during its closing jury
arguments:


 They want to talk about guns and knives. The only weapon in this case is this one
with [the victim's] blood that came from [appellant] when he stuck him.


 Talked about seeing [the victim] with a knife in the past. We know [appellant] has
knives in his past. One, because he stuck a guy with this one. Two, because we got
deadly weapon findings on two judgements [sic] and both of them are knives in
Freestone County. He seems to be somehow proud of the fact that he's doing fifteen
years for that. He's the one that [sic] brought that up.
4. Sic passim.
5. The record reflects that on the day before trial on the aggravated assault charge appellant
rejected another offer from the State for appellant to plead guilty to this charge in exchange for a
recommended sentence of eight years "to run concurrent to any other sentence that [appellant might]
currently be serving."
6. Appellant testified at the motion for new trial hearing that he told his trial lawyer not to elicit
this information.


 Q. [APPELLATE LAWYER]: How did you understand that to mean when you wrote
it, trying to get the point out to the Court?


 A. [APPELLANT]: Well, my attorney, Greg Tate, at the time, he told me that he felt
like it would be best that we bring that case out that I was-that I was on appeal for,
but I had told Mr. Tate not to. 
7. Appellant's trial lawyer testified on redirect examination:


 Q. [APPELLATE LAWYER]: Let me rephrase my question. You're now aware that
[Rule 609 does] not allow the State to impeach him with that conviction.


 A. [TRIAL LAWYER]: Yes.


 Q. Okay. So, whether it was to give the appearance of truthfulness or not, that's
something that would have been collateral because the State couldn't have brought
that in, in the first place, and made him look like he was lying, if you withheld it.


 A. Correct. 
8. The claim literally made in this ground is that appellant's trial lawyer performed deficiently
because he "impeached" appellant with an inadmissible conviction. See Tex. R. Evid. 609(a)
(setting out general rule for impeachment by evidence of conviction of crime); Tex. R. Evid. 609(e)
(pendency of an appeal renders evidence of a conviction inadmissible for impeachment purposes). 
The record, however, reflects that appellant's counsel was not "impeaching" appellant with these
convictions. See Robertson, slip op. at 3-4. The claim literally made in this ground, therefore, is not
presented in this case, and we do not address the decision of the Court of Appeals with the premise
that appellant's trial lawyer was "impeaching" his own client under Rule 609(a) with an inadmissible
conviction under Rule 609(e).
9. But see Ex parte Chandler, S.W.3d , slip op. at 4 n.6 (Tex.Cr.App. No. 60,942-01,
delivered April 13, 2005) (discussing the proliferation of ineffectiveness challenges).
10. See Rule 609(e); Commonwealth v. Moore, 715 A.2d 448, 452 (Pa. Super. Ct. 1998) (defense
counsel errs to introduce evidence of defendant's prior convictions for purpose of preventing
prosecution from first bringing out such evidence on cross-examination when the prior convictions
are unavailable to the prosecution for impeachment purposes).
11. See Strickland, 466 U.S. at 689 (defendant claiming ineffectiveness of counsel must
overcome presumption that the challenged action "might be considered sound trial strategy").
12. The record also supports a finding that appellant assented to the presentation of this
information to the jury. Despite appellant's assertions to the contrary, the trial court did not have
to believe appellant's testimony at the motion for new trial hearing that he told his trial lawyer not
to elicit this information. See generally Guzman v. State, 955 S.W.2d 85 (Tex.Cr.App. 1997). 
13. The opinion in Menchaca decided that trial counsel performed deficiently for permitting the
defendant to be impeached with a prior conviction when the law was unsettled on whether that prior
conviction could be used for impeachment. See Menchaca, 854 S.W.2d at 130-32; but see Vaughn
v. State, 931 S.W.2d 564, 566-67 (Tex.Cr.App. 1996) (basing an ineffective assistance of counsel
claim on case law that is unsettled at the time of counsel's actions "would be to engage in the kind
of hindsight examination of effectiveness of counsel the Supreme Court expressly disavowed" in
Strickland"). 
14. In its brief, after conceding that it could not use appellant's incarceration on the two
convictions to impeach appellant, the State makes the following arguments, which we do not find
persuasive:


 Further, appellants [sic] trial attorney stated he had informed the appellant that his
case was not a strong case for self defense, but appellant demanded to testify and that
appellant had stated that the jury would understand. (Footnote omitted). Faced with
the fact that the appellant would testify defense counsel had to use the best defense
and strategy that could be had under the particular facts and circumstances of the
case. It can hardly be said that pursuing a completely truthful strategy is not
appropriate, especially in light of a self defense theory where the whole issue is
whether the appellant should be justified in his actions. (Footnote omitted). As part
of this strategy, by initially offering these convictions appellant's counsel removed
any harmful effects in the event, that appellant opened the door, (footnote omitted)
which would have had a detrimental effect on appellants [sic] self defense theory. 
Appellant's trial counsel is in a much better position to judge whether appellant will
open the door either directly, or inadvertently. Also as part of this strategy appellant
was allowed to admit drug offenses implicating his heavy involvement in drugs. 
While this did paint appellant as a drug user and drug dealer, counsel also elicited
testimony that victim was a drug user and dope dealer, that the other witness was a
drug user, and then brought all these facts out at closing. (Footnote omitted). In
essence, this also put in front of the jury that everyone who was involved and
observed the incident were involved in drugs. So one could conceivably believe this
incident was a dope deal gone bad, or just thug on thug crime.