In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00131-CR


______________________________




FLORENCE JEAN FISHER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 354th Judicial District Court


Hunt County, Texas


Trial Court No. 22533




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 The brutal reality of the death of four-year-old Jordan Mach, and of his victimization while
living at his final place of residence, was vividly portrayed by the evidence. Autopsy and
photographic evidence demonstrated that Jordan died from blunt force injury; that he had been
severely beaten on his head, face, chest, shoulders, back, arms, legs, and buttocks; and that many
fresh wounds and numerous scars were scattered over much of his small body.

 After Jordan's natural mother had died, Jordan and three siblings had come to live in a nice-looking, two-story brick house in Hunt County with their father, Anthony Fisher; Fisher's wife,
Florence Jean Fisher; and Florence's four grandchildren. (1)

 In a jury trial, Florence was convicted for injury to Jordan in causing bodily injury by
omission. She was sentenced to ten years' imprisonment. (2)

 On appeal, Florence contends that the evidence is legally and factually insufficient to support
her conviction for injury to Jordan in causing bodily injury by omission and that the trial court erred
by allowing the State to exhibit photographs of the children during its opening statement. We affirm
the trial court's judgment because we hold (1) legally and factually sufficient evidence supports the
judgment, and (2) even if error, no harm appears from the trial court's approval of the State's
displaying photographs during its opening statement.

(1) Legally and Factually Sufficient Evidence Supports the Judgment

 In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000).

 In a factual sufficiency review, we view all the evidence in a neutral light and determine
whether the evidence supporting the verdict is so weak that the jury's verdict is clearly wrong or
manifestly unjust or against the great weight and preponderance of the evidence. Marshall v. State,
210 S.W.3d 618, 625 (Tex. Crim. App. 2006); Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim.
App. 2006); Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In a factual sufficiency
review, we are to afford "due deference" to a jury's determinations. Marshall, 210 S.W.3d at 625.

 The Texas Penal Code provides that

 (a) A person commits an offense if he intentionally, knowingly, recklessly, or with
criminal negligence, by act or intentionally, knowingly, or recklessly by omission,
causes to a child . . . :

 

 (1) serious bodily injury . . . .


 . . . .


 (b) An omission that causes a condition described by Subsection (a)(1) . . . is conduct
constituting an offense under this section if:

 (1) the actor has a legal or statutory duty to act; or

 

 (2) the actor has assumed care, custody, or control of a child, elderly individual, or disabled individual.

Tex. Penal Code Ann. § 22.04(a), (b) (Vernon Supp. 2006) (emphasis added). There is no
question that Florence had assumed the care, custody, and control of Jordan and had the duty to act. 
There is also no question that death is included in the definition of "serious bodily injury." Tex.
Penal Code Ann. § 1.07(a)(46) (Vernon Supp. 2006).

 Paramedic Becky Drake testified that Jordan was cold and nonresponsive when she first saw
him. Drake responded to a call at the residence and described Jordan as having bruises, lacerations,
avulsions (tears), and cuts all over his body. The photographs of his body introduced at trial support
her descriptions in each respect. She also testified that Jordan's penis was falling off. Although
attempts were made to resuscitate Jordan, he did not respond. Scott Pierce, the emergency room
doctor who admitted Jordan, testified similarly about his physical condition, as did a police officer
and a Child Protective Services investigator.

 Young Anthony testified that Florence and Anthony, Sr., beat young Anthony and Jordan,
made them bend over and touch their toes, and hit them hard with a belt. He testified that sometimes
Florence would sit on the couch while his father beat Jordan and that sometimes she would sit on
them while the father hit them. He also testified to a number of other punishments--which could
appropriately be called torture--inflicted on Jordan, including being placed in a tub full of ice water
and having a rubber band wound tightly around his penis so he would not wet the bed.

 Linda Duggan, a counselor who worked for the State, testified that young Anthony had told
her, during their counseling sessions, about the above-referenced actions of Florence and the senior
Anthony. Duggan also recounted young Anthony's statement to her that Florence threatened to have
his father whip him if he did not do as he was told--whippings described as beatings with straps and
belts, while being held down. Duggan also testified that young Anthony had told her that Florence
had individually beaten him, locked him in a closet numerous times, and made him stand in a bent-over position for hours--even all night long--at the side of her bed. According to Duggan's
testimony, young Anthony began telling about the injuries inflicted by Florence in 2005, only after
he finally became sure that he was going to be adopted by his grandparents.

 Jazmine Mach testified that Florence did nothing when her father hit Jordan, and that
Florence hit Jordan more than once with a shoe and a belt. She described Jordan as having purple
arms and legs, lots of sores, and swollen eyes. 

 The jury was charged that it could find Florence guilty either for her individual acts or
omissions or as a person criminally responsible for the conduct of her husband. The evidence as set
out above shows that she did not attempt to stop her husband from severely beating Jordan, that she
threatened Jordan with beatings, and that she beat him herself. The documentary evidence supports
that testimony. The evidence is both legally and factually sufficient to support the verdict.




(2) Even if Error, No Harm Appears from the Trial Court's Approval of the State's Displaying
Photographs During Its Opening Statement

 Florence next contends that the trial court erred by allowing the State to show five
photographs of the children to the jury during its opening statement at trial. The record reflects that
the State, through a sponsoring witness, (3) provided a "predicate" for two of the photographs before
trial began. State's Exhibits 270-72 are photographs of, respectively, young Anthony, Anthonisha,
and Jazmine taken the day they were removed from the house. Exhibit 70 is a photograph of Jordan
taken before he moved into the Fisher house, and Exhibit 327 is a photograph taken of Jordan's body
in the hospital emergency room. 

 Florence's counsel objected to the procedure on numerous grounds: (1) it was during an
opening statement, (2) it amounted to putting on proof during opening, (3) the photographs were
unfairly prejudicial, and (4) nobody knew whether the photographs would ultimately be admitted into
evidence. (4) Thereafter, however, based on representations by State's counsel that the predicate could
and would be established during presentation of evidence, the trial court proceeded and summarized
its understanding:

 I understand [Florence's counsel] is willing to go forward with opening with the
understanding that you will be able to provide a predicate for them later. The
objections, other than predicate, are overruled. Objections as to predicate are - the
ruling is withheld from - by agreement. They will be allowed to be used in opening
statement.

 On appeal, Florence focuses her argument on an alleged improper application of Article
36.01(a)(3) of the Texas Code of Criminal Procedure. See Tex. Code Crim. Proc. Ann. art.
36.01(a)(3) (Vernon 2007). That article sets out the order of proceeding in trial of criminal cases. 
In connection with opening statements, it provides that "[t]he State's attorney shall state to the jury
the nature of the accusation and the facts which are expected to be proved by the State in support
thereof." Id. The purpose of Article 36.01 is to communicate to the jury the party's theory of the
case in order to help the jury evaluate the evidence as it is being presented. Parra v. State, 935
S.W.2d 862, 871 (Tex. App.--Texarkana 1996, pet. ref'd); see Love v. State, 69 S.W.3d 678, 680
(Tex. App.--Texarkana 2002, pet. ref'd). The State's opening statement in a criminal case is an
outline of facts which the prosecution in good faith expects to prove. Ketchum v. State, 199 S.W.3d
581, 597 (Tex. App.--Corpus Christi 2006, pet. ref'd); Parra, 935 S.W.2d at 871.

 The unanswered question is whether such an outline is limited to words alone, or whether
a party may use visual aids to assist in that presentation. Florence's counsel suggests that this is a
case of first impression and that policy forbids displaying of such items to the jury during opening
statement. Counsel argues that, if not restricted here, the State will move from photographs of
victims and others to bloody clothes, live victims with massive scars, or to any other item that may
eventually be presented as evidence.

 Counsel appears to be correct in stating that this issue has not heretofore been addressed in
a criminal context. Neither the parties nor our own research have found any criminal opinions on
point. The analogous civil rule--which is almost identical to the criminal rule--has been analyzed (5)
in several cases, and the general consensus has been that the trial court has discretion to allow the
use of such materials. Cases suggest that, if the items used are ultimately admitted at trial, any error
in allowing their use during opening statements is harmless.

 In the civil context, the Fourteenth Court of Appeals has held that the rule 

 does not afford counsel the right to detail to the jury the evidence which he intends
to offer, nor to read or display the documents and photographs he proposes to offer. 
Where counsel is allowed to detail expectations in the opening statement, he places
matters before the jury without the determination of their admissibility. See Ranger
Ins. Co. v. Rogers, 530 S.W.2d 162, 170 (Tex. Civ. App.--Austin 1975, writ ref'd
n.r.e). This practice misleads and confuses the jurors as between counsel's mere
expectations and evidence that is actually admitted.

Guerrero v. Smith, 864 S.W.2d 797, 799 (Tex. App.--Houston [14th Dist.] 1993, no writ). The
court pointedly stated that, "although this conduct should not have been tolerated by the trial court,
we are bound by the abuse of discretion standard which gives trial courts wide latitude in limiting
opening statements." Id. at 800. The court concluded that no harm was shown because the
photograph was indeed later admitted into evidence.

 The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts
present an appropriate case for the trial court's action; rather, it is a question of whether the trial court
acted without reference to any guiding rules or principles, and the mere fact that a trial court may
decide a matter within its discretionary authority differently than an appellate court does not
demonstrate such an abuse. Howell v. State, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005).

 The use of photographs is not included within the strict language of the article. Allowing the
use of photographs, which are later properly admitted and shown to the jury, may not necessarily be
outside the range of the trial court's discretion. We need not decide today whether any and all
evidence may be pre-presented to the jury during opening statements, but we suggest that the use of
any such visual aids should be carefully controlled by the trial court. We do not find that the trial
court's ruling here was an abuse of discretion, even if we would have decided differently were we
in the position of the trial judge. 

 We do hold today that Florence was not harmed by the use of the photographs in opening
statement--even if it was error to allow it--since the photographs were ultimately admitted into
evidence. Cf. Chamberlain v. State, 998 S.W.2d 230, 235 (Tex. Crim. App. 1999); McFarland v.
State, 845 S.W.2d 824, 840 (Tex. Crim. App. 1992); Siqueiros v. State, 685 S.W.2d 68, 71 (Tex.
Crim. App. 1985) (subsequently admitted evidence can render evidentiary error harmless). We note,
also, that Florence has not provided this Court with an explanation of how she believes she was
harmed by the State's use of the photographs during opening statement. See Tex. R. App. P. 38.1(h).

 The contention of error is overruled.

 We affirm the judgment.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: February 1, 2007

Date Decided: April 11, 2007


Publish
1. The record indicates that four children, Anthony Ray, Anthonisha, Jordan, and Jazmine,
were Anthony Fisher's biological children, and that the other four children in the household were
Florence's biological grandchildren.
2. Florence was also prosecuted in another case, that one involving the abuse of young
Anthony. She was convicted in that case as well, and her appeal from that conviction is before this
Court in Fisher v. State, cause number 06-06-00132-CR.
3. Trial had not yet begun, and evidence was not yet being presented to the jury. By definition,
a witness is one who gives evidence in a cause before a court.
4. We also note that the State's representation that "pictures are offered in opening in every case
across the state" is a considerable overstatement. 
5. "(a) The party upon whom rests the burden of proof on the whole case shall state to the jury
briefly the nature of his claim or defense and what said party expects to prove and the relief sought."

Tex. R. Civ. P. 265(a).



 child mentioned her
mom, Griffith asked, "What does your mom do?" and the child replied, "nasty stuff." The child then
again tried to demonstrate. 

 Throughout the interview, the child was very expressive and talkative. At all times, she
stated that the only person who did "nasty stuff" and "touches me" was her mom. In many instances,
the child volunteered more information than was requested in the questions. The statements made
in the interview are not inconsistent with those made to the outcry witness and nurse. We find the
statement exhibited a high degree of spontaneity and was consistent with other statements the child
made.

B. Mental State of the Declarant

 In the interview with Griffith, the child identified her school, teacher, and the names of all
persons with whom she lived, including her dog, Rascal. On the videotape, the demeanor of the
child was that expected of a five-year-old. She moved around the room and stood up on several
occasions, and indicated she would rather play with nearby toys. Overall, she appeared relaxed and
cooperative, with the usual movement that would normally accompany a child of her age. It was
obvious from the many references by the child that she did not understand the gravity of the conduct
she described. The interview reveals the candor of a five-year-old child explaining sexual acts,
without comprehending the seriousness of such activity.

C. Use of Terminology Unexpected of a Child of Similar Age

 The child did use sexual terminology not expected of a five-year-old. However, what clearly
is evident on the videotape is the child's belief that such activity was not abnormal. On many
occasions, she requested that Griffith allow her to graphically demonstrate sexual acts. On some of
the occasions, the child in fact demonstrated such acts. She clearly showed Griffith her position in
relationship to Edwards during sexual activity. Her terminology, and more importantly, her
demonstration of the way in which the sexual acts occurred, far exceed that knowledge which a
five-year-old child would normally possess.

D. Lack of Motive to Fabricate

 The defendant in this case is the child's mother. There is no indication in the testimony that
the child feels any animosity toward her mother. She did mention during the interview that she did
not like another member of the family. The absence of any motivation for the child to fabricate such
a story as to her own mother indicates that such statement was truthful.

E. The Giving of an Age-Appropriate Oath

 Before inquiring of the child concerning any issue involved, Griffith clearly explained to the
child they were in the "truth room." She explained to the child it was important to tell only what
really happened and then asked the child if she knew what happened if she should lie. The child
answered that you get a "whooping" (whipping) if you tell a lie. Griffith clearly brought to the
child's attention the need to be honest in the interview, and the child acknowledged she understood
the consequences of lying. This supports the reliability of her statement.

F. Presence of the Defendant at the Interview

 In this instance, the defendant is the mother. The defendant was not present during the
interview. While we agree the absence of the defendant is a serious factor to be considered, it must
be weighed against all other indicia of reliability of such statement when viewed in the totality of
the circumstances.

G. Relationship of the Declarant to the Interviewer

 The record does not indicate the child had any prior relationship with Griffith. From all
appearances on the videotape, they were strangers before this interview. It does not appear the child
had any reason to try to "please" Griffith. The absence of such a relationship lends additional
credibility to the child's statement.

H. Length of Time Between First Outcry and Making a Statement

 The outcry witness testified the initial contact occurred on January 31, 2001. It appears the
videotaped interview was conducted by Griffith that same day. This would indicate that virtually
no opportunity could exist for the child to refine her story or to have extensive contacts that might
affect the nature of that story. Accordingly, this weighs in favor of admission.

I. The Quality of the Tape

 The videotape clearly shows both Griffith and the child at all times during the interview. 
Furthermore, the audio portion of the videotape is clear. The voices can be heard and identified
readily. The activity of the child during the interview is fully documented. The videotape is of high
quality.



J. Submission of Written Interrogatories

 On September 21, the State filed a notice of intention to use the videotaped statement. Voir
dire began on October 22. Defense counsel stated at voir dire she would submit written
interrogatories to be videotaped and submitted to the jury along with the statement, but later decided
not to do so. No interrogatories were submitted. 

K. Manner in which the Interview was Conducted

 The interview appeared to be conducted in a professional manner. Griffith began by asking
the child simple questions, such as where she went to school, who was her teacher, the names of her
family and dog. The child seemed to be placed at ease. As we have discussed, Griffith properly
admonished the child of the necessity of telling the truth. As the child lost focus, Griffith would
remind the child they needed to continue their talk, and she would again become reasonably
attentive. The demeanor and behavior of the child indicated she was an active, talkative
five-year-old. Griffith continually told the child that whatever she said would not get her in trouble. 
Even though the child on several occasions indicated she wanted to demonstrate sexual acts with
Griffith, Griffith reminded the child she needed only to explain such acts. The entire interview lasted
approximately forty-five minutes. At the conclusion of the interview, Griffith left the child alone
in the room for a few minutes while the videotape was operating. The child drew on the blackboard
and appeared at ease.

 For the reasons we have analyzed above, we conclude that, based on the totality of the
circumstances, and in particular the factors to consider for a "particularized guarantee of
trustworthiness," the child's statement is sufficiently reliable to allow the admissibility of this
videotape without violation of the Confrontation Clause. Specifically, we find that the factors
supporting the reliability of the statement clearly outweigh those that do not. We therefore conclude
constitutional error has not been shown.

III. Expert Witness Testimony

 Edwards asserts the trial court erred in admitting expert testimony of Ed Wagoner and Loretta
McCarty. Edwards complains such testimony constituted an improper opinion as to the truthfulness
and veracity of the child.

 Ed Wagoner, a former Child Protective Services worker, was asked:

 Q. After you received an outcry for sexual abuse, what factors did you
look at to determine -- what factors would you look at to determine if a child was
telling the truth?


 In answering the question, the witness stated that the factors were the age, level of
development, what a child would typically know about sexuality at that point in time, appropriate
sexual knowledge, opportunity, and access to the defendant.

 Thereafter, Wagoner was asked, "How does [the victim] -- what you saw on the tape, how
does that - how does her testimony on the tape fit into what those factors are?" The witness then
answered that the child exhibited a great deal of knowledge about sexual activity and that she was
able to identify inappropriate sexual activity and describe it as being nasty. Wagoner also pointed
out she was able to describe in detail what had happened to her.

 Later, McCarty was asked, "How does [the victim] -- in your criteria how does she -- what
factors that you see in that tape that indicate that she would be truthful type factors? [Objections.]
. . . . Q. Now, you understand I'm not asking you whether she's telling the truth. I'm asking are there
factors that you see there that indicate to you there's some truthfulness to what she's saying." The
answer consisted of McCarty's explanation of gestures and demonstrations by the child on the tape,
of her unusual behavior in trying to encourage Griffith to participate with her in a sexual
demonstration, of her actions clearly describing and demonstrating on a couch what happened to her
and of knowing it felt good.

 An expert witness may not testify that a witness is truthful, but an expert may testify that the
child exhibits symptoms consistent with sexual abuse.  Cohn v. State, 849 S.W.2d 817, 819 (Tex.
Crim. App. 1993). The witness may not "cross the line" and testify directly as to the victim's
truthfulness, as it does not concern a subject matter on which the testimony of an expert witness
could assist the trier of fact. Yount v. State, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993). 

 To be admissible, expert testimony must "assist" the trier of fact. Tex. R. Evid. 702; Duckett
v. State, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990). Expert testimony assists the trier of fact
when the jury is not qualified to "the best possible degree" to determine intelligently the particular
issue without the help of the testimony. Duckett, 797 S.W.2d at 914. But, the expert testimony must
aid--not supplant--the jury's decision. Id. Expert testimony does not assist the jury if it constitutes
"a direct opinion on the truthfulness" of a child complainant's allegations. Yount, 872 S.W.2d at 708.

 The evidence here does more than describe characteristics common among sexually abused
children. Wagoner was asked about factors to determine if a child was "telling the truth." After
describing the factors for truthfulness, the witness was asked, "How does [the victim] fit . . . into
what those factors are?" The witness then testified she exhibited such factors. McCarty likewise
testified over objection as to factors that indicated to her the child exhibited some indicia of
truthfulness in the interview.

 The witnesses here were asked to comment directly on factors to determine if the child was
telling the truth. These observations, such as age, level of development, sexual knowledge,
opportunity, and access, may all be judged and determined by a jury without the help of an expert.

 We find that the testimony regarding the factors for truthfulness observed by the experts
directly comment as to the truthfulness of the child. As such, it does not assist the jury and is
inadmissible. Tex. R. Evid. 702.

IV. Medical History Testimony

 Edwards further urges that the trial court erred by allowing the testimony of Geri Lawson,
the sexual assault nurse examiner, concerning statements the child made to her during a medical
examination.

 The evidence shows the child was taken to the nurse for a medical examination at the
hospital. Rule 803(4) of the Texas Rules of Evidence provides an exception to the hearsay rule for
"statements made for purposes of medical diagnosis or treatment and describing medical history, or
past or present symptoms, pain, or sensations, or the inception or general character of the cause or
external source thereof insofar as reasonably pertinent to diagnosis or treatment." Tex. R. Evid.
803(4); Mendoza v. State, 69 S.W.3d 628, 633 (Tex. App.-Corpus Christi 2002, pet. ref'd); Beheler
v. State, 3 S.W.3d 182, 188 (Tex. App.-Fort Worth 1999, pet. ref'd); Torres v. State, 807 S.W.2d
884, 886-87 (Tex. App.-Corpus Christi 1991, pet. ref'd) (finding emergency room nurse could testify
as to victim's statement under Rule 803(4) even though nurse was also collecting evidence). 

 Edwards challenges this evidence on the basis that it violates her right of confrontation under
the Sixth Amendment to the United States Constitution. She cites Lopez v. State, 18 S.W.3d 220
(Tex. Crim. App. 2000), for the proposition that the Confrontation Clause will prevail if there is a
conflict between it and the Rules of Evidence. In Lopez, the defendant was attempting to present
evidence that the victim had previously made false accusations of sexual assault against other
individuals. The State objected under Rule 608(b) of the Texas Rules of Evidence. The issue was
whether the Confrontation Clause demanded that the evidence of the complainant's prior false
allegations of abuse against a person other than the defendant was admissible despite Rule 608(b)'s
proscription against admitting specific instances of conduct. Id. at 222-23. The Texas Court of
Criminal Appeals stated that "the Confrontation Clause occasionally may require the admissibility
of evidence that the Rules of Evidence would exclude." Id. at 225. The final conclusion of the court
was that such evidence was inadmissible and the Confrontation Clause did not mandate its
admissibility. Id. at 226.

 In this case, Edwards is arguing for the exclusion of evidence rather than its admissibility,
as in Lopez.

 As we have previously discussed, not all out-of-court statements are prohibited by the
Confrontation Clause. Wright, 497 U.S. 805. If the statement does fall within a firmly rooted
hearsay exception, then reliability can be inferred without more. There is no doubt the exception for
statements made for purposes of medical diagnosis or treatment is firmly rooted. White, 502 U.S.
at 356 n.8; United States v. Sumner, 204 F.3d 1182 (8th Cir. 2000).

 As the medical diagnosis hearsay exception is well established as a firmly rooted exception
to the hearsay rule, admission of this evidence does not violate the Confrontation Clause of the Sixth
Amendment to the United States Constitution. The testimony of the sexual assault nurse examiner
was properly admitted.





 We reverse the judgment and remand the cause to the trial court for further proceedings
consistent with this opinion.




 Jack Carter

 Justice


Date Submitted: March 26, 2003

Date Decided: April 22, 2003


Publish
1. Tex. Code Crim. Proc. Ann. art. 38.071 (Vernon Supp. 2003).
2. In Idaho v. Wright, the Court determined that it was appropriate to apply the same analysis
to such evidence as to other types of hearsay and applied the "indicia of reliability" requirement to
determine whether a firmly rooted hearsay exception allowed its admission, or alternatively, if the
evidence was supported by a showing of particularized guarantees of trustworthiness. 497 U.S. 805,
816 (1990).
3. The analysis of procedures for in-court testimony such as closed circuit television should
be conducted in accordance with Maryland v. Craig, 497 U.S. 836, 845 (1990), and Coy v. Iowa, 487
U.S. 1012, 1019 (1988), requiring the witness to be unavailable to authorize such modified in-court
testimony; whereas, in White v. Illinois, the court determined it is not necessary to prove a child
needs protection of his or her physical or psychological well-being as a prerequisite to introducing
statements the child made out of court. 502 U.S. 346, 358-59 (1992).